694 F.2d 923
 Fed. Sec. L. Rep. P 99,001
Irving L. GARTENBERG, Plaintiff-Appellant,
v.
MERRILL LYNCH ASSET MANAGEMENT, INC., Merrill Lynch, Pierce,
Fenner and Smith, Inc., and Merrill Lynch Ready
Assets Trust, Defendants-Appellees.
Simone C. ANDRE, Plaintiff-Appellant,
v.
MERRILL LYNCH READY ASSETS TRUST, and Merrill Lynch Asset
Management, Inc., Defendants-Appellees.
 Nos. 11, 14, Dockets 82-7142, 82-7074.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 15, 1982.
Decided Dec. 3, 1982.
 
 William P. Rogers, New York City (Stanley Godofsky, James N. Benedict, Anne Elizabeth Fontaine, Rogers & Wells, New York City, of counsel), for defendants-appellees Merrill Lynch Asset Management, Inc. and Merrill Lynch, Pierce, Fenner & Smith, Inc.
 Stanley M. Grossman, New York City (Stephen P. Hoffman, Bruce G. Stumpf, Pomerantz, Levy, Haudek & Block, New York City, of counsel), for plaintiff-appellant Gartenberg.
 Sidney B. Silverman, New York City, for plaintiff-appellant Andre.
 James K. Manning, New York City (James B. May, A. Robert Pietrzak, Kent E. Daiber, Brown, Wood, Ivey, Mitchell & Petty, New York City, of counsel), for defendant-appellee Merrill Lynch Ready Assets Trust.
 Before MANSFIELD, VAN GRAAFEILAND and NEWMAN, Circuit Judges.
 MANSFIELD, Circuit Judge:
 
 
 1
 Irving L. Gartenberg and Simone C. Andre, two shareholders of the Merrill Lynch Ready Assets Trust, a money market fund (the "Fund"), appeal from a judgment of the Southern District of New York, Milton Pollack, Judge, entered after a non-jury trial, dismissing their consolidated derivative actions against the Fund and its affiliates, Merrill Lynch Asset Management, Inc., the adviser and manager of the Fund (the "Manager") and Merrill Lynch, Pierce, Fenner & Smith, Inc. (the "Broker"). The plaintiffs claimed violations of Sec. 36(b) of the Investment Company Act of 1940, 15 U.S.C. Sec. 80a-35(b) (the "Act").[1] 528 F.Supp. 1038, 1040. The principal claim is that the fees paid by the Fund to the Manager for various services, including investment advice and processing of daily orders of the Fund's shareholders, were so disproportionately large as to constitute a breach of fiduciary duty in violation of Sec. 36(b). We affirm the judgment dismissing the complaint.
 
 
 2
 Since the facts are fully set forth in detail in Judge Pollack's opinion, 528 F.Supp. 1038, only a brief summary here is necessary. The Fund, organized in 1975 as a no-load, diversified, open-end investment company, invests in short-term money market securities expected to pay the highest current income consistent with preservation of capital and maintenance of liquidity, such as short-term securities of the U.S. Government or its agencies, bank certificates of deposit, and commercial paper. An investor may purchase and redeem shares of the Fund without any charges or penalties. There is a daily declaration of dividends, reflecting the net income of the Fund's portfolio. As the district court noted, the purchaser's investment in the Fund is more like a bank account than the traditional investment in securities. Idle money can be invested in the Fund for as little as a day and put to work earning interest. The ease of entrance and egress for the investor, coupled with the ability to share in high yields which the modest investor could not obtain through a bank deposit and might not be able to realize alone, has with the rise (until recently) of interest rates attracted an increasing number of investors. As a result the size of the Fund increased enormously over a few years, from $288 million in April 1977 to over $19 billion as of September 1981.
 
 
 3
 The Fund has an 8-person Board of Trustees, of whom 2 are interested and 6 are independent and unaffiliated. The operations of the Fund are conducted by the Manager, which provides the Fund with office space and facilities, administrative staff, equipment, portfolio management, compliance with SEC and state recordkeeping and reporting requirements, and services to Fund shareholders. For the processing of approximately 80% of the purchases and redemptions of shares of the Fund the Manager uses the Broker, another Merrill Lynch affiliate, which is the largest registered broker-dealer in the United States, with 408 domestic offices located in numerous cities and towns, in which more than 7,000 account executives are located. In addition, the Manager uses the vast facilities of the Merrill Lynch organization and its affiliates to render special services to the Fund. For example, Merrill Lynch Economics, Inc. provides economic research and forecasting services while Merrill Lynch Government Securities, Inc. provides expertise with respect to U.S. government and agency securities. A customer located anywhere in the United States can call the nearest office of the Broker or the Bank of New York, the Fund's custodian and transfer agent, order the purchase or redemption without charge of shares of the Fund, and through use of wires and computers the transaction will be carried out immediately. An average of 30,000 such orders are processed daily by the Broker's large organization.
 
 
 4
 Under the foregoing management the Fund has performed reasonably well in terms of average percentage yields for its shareholders. Its average percentage yields from 1978 through 1980 were slightly above the average for all similar funds. In 1980 it ranked 37th out of 76 money funds in terms of yield.
 
 
 5
 For all of these services the Manager charges the Fund an advisory fee based on a percentage of the average daily value of the Fund's net assets. The fee rate is graduated downward as the Fund's total assets increase in value. Since 1979 the schedule called for payment of 0.50% ( 1/2 of 1%) of the Fund's average daily value of net assets under $500 million and for various intermediate percentages as the value of the net assets increases down to 0.275% for assets in excess of $2.5 billion, resulting in an effective rate of 0.288%. This schedule is the product of a series of negotiations by the 6 independent Fund Trustees with the Manager over the period from 1977 to 1979, which resulted in reductions in the effective rate as the Fund grew in size.
 
 
 6
 Three studies were made at the Fund's instance to determine the estimated cost of the processing services provided by the Broker through the Manager to the Fund, two by the Merrill Lynch organization's internal accounting staff and one by the independent accounting firm of Peat, Marwick, Mitchell & Co. ("PMM"). The estimates ranged from $2.02 to $7.50 per Fund order. The earlier internal study which produced the lowest figure did so mainly because it used a modified "incremental" cost method of accounting, based on the assumption that most costs would have been incurred by the Broker even if it had processed no Fund orders. By the time the PMM study was conducted in late 1979, however, modified full cost accounting methods were used for the reason that Fund orders represented a sizeable proportion of all business processed by the Broker; indeed, by April 1981 Fund orders accounted for 37% of all Broker business, necessitating the hiring by the Broker of close to 3,000 non-sales personnel. Had the Manager been required to reimburse the Broker for these costs instead of their being absorbed by the Broker as another Merrill Lynch affiliate, the Broker's net profit after taxes would have been greatly reduced, resulting in a figure ranging from a 38.4% profit to a substantial loss depending on which cost accounting study was used. In 1980, for instance, the last calendar year for which full figures are available, the Manager's fee was slightly over $33 million on the Fund's average net assets of $11.16 billion. Based on the volume of orders generated by 675,324 purchasers, the Broker's processing costs, estimated according to the PMM study, were so large that the Manager suffered a loss during 1980. 528 F.Supp. at 1053-54.
 
 
 7
 Judge Pollack, construing the legislative history of the Act, decided that the standard for determining whether the Manager had been guilty of a breach of fiduciary duty in violation of Sec. 36(b) was not whether its fees were "reasonable" as urged by plaintiffs but whether they were unfair to the Fund and shareholders, which was to be determined by reference to the nature, quality and extent of the manager's services to the Fund, the money market fund industry practice and level of management fees, and to a lesser extent the Manager's net earnings as a result of providing the services. After reviewing the evidence and appraising the live witnesses who testified, he concluded that the compensation paid to the Manager was fair. Id. at 1055. The package of services described above was found to be extensive and valuable, providing Fund customers with the vast facilities of the Merrill Lynch organization, which were not available to non-Merrill Lynch funds.
 
 
 8
 The Manager's fee schedule was found by Judge Pollack to "bear a fair relation to the subject matter from which they are derived". Id. at 1068. He further found that "the total fee was fair to the Fund" after taking into consideration the nature and extent of the services, the fees charged by other advisers to other money market funds, the overall cost to the Merrill Lynch organization of providing the services, and the fee schedule's allowance for economies of scale by reducing the rate as the Fund's net assets increased. Id. at 1055. Judge Pollack also gave weight to the process by which the 6 noninterested trustees of the Fund approved of its management agreement with the Manager. The trustees, who were represented by capable independent counsel, were found to be competent, independent and conscientious in the performance of their duties. They were furnished with sufficient information to evaluate the contract. They thoroughly reviewed and weighed all facts pertinent to the fee, many of which are now part of the record, before approving the Manager's fee after negotiations.
 
 
 9
 The district court rejected plaintiffs' argument that in determining the fairness of the Manager's compensation the court must take into account as an offset to the Manager's fee the value to the Merrill Lynch organization of "fall-out" business generated by Fund customers who, after opening up a no-charge Fund account, transact other financial business with the Merrill Lynch Broker, such as purchases of stocks and bonds, for which the customer is charged a fee or commission. Thirty-eight percent of new Fund customers for the third quarter of 1979 transacted some non-Fund business through the Broker by January 1980. The fall-out benefit argument was rejected on the ground that any such offset could not be measured since it could not be established with certainty and without heavy expense what portion of the increase in brokerage business would have gone to the Broker without regard to the Fund. Judge Pollack further reasoned that the idea of an offset lacked logic since the customer would in any event have to pay a brokerage fee on non-Fund business. The possible benefit to the Merrill Lynch organization from a "float" resulting from its having the use of redemption funds before paying them to the redeeming Fund customer was found unpersuasive since it was obvious to all concerned. Plaintiffs' claim that there was unnecessary duplication in the Manager's services based on the Bank of New York's obligation to perform them was rejected for lack of proof.
 
 
 10
 The district court further found that an adequate disclosure of the pertinent facts needed to determine the fairness of the Manager's fee had been made to the Fund's trustees and shareholders.
 
 DISCUSSION
 
 11
 Section 36(b) of the Investment Act of 1940, 15 U.S.C. Sec. 80a-35(b), which governs this case, provides that "the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services" paid by the investment company or its security holders and that in an action by a security holder on behalf of the investment company against the adviser or affiliate "[i]t shall not be necessary to allege or prove that any defendant engaged in personal misconduct" but "the plaintiff shall have the burden of proving a breach of fiduciary duty."
 
 
 12
 Appellants contend that the district court erred in rejecting a "reasonableness" standard for determining whether the Manager performed its "fiduciary duty" in compliance with Sec. 36(b). They further urge that the district court erred in relying primarily, in determining whether there was a breach of fiduciary duty, on other money market funds' level of management fees and on the Broker's costs. They argue that since each investment company fund is a captive of its manager, from which it cannot as a practical matter divorce itself, and since there is no possibility that a competitor will take the fund's business from its manager by offering a lower rate, the manager sets its own fee and the fund has no practical alternative but to pay it. It is contended that the test should therefore be what rate would have resulted from arm's-length negotiations in light of the services to be rendered. Appellants further contend that under this standard the fee in this case would have been substantially lower because of economies of scale, the Fund's massive bargaining power as the largest fund in history, and the Broker's duplication of services which the Bank of New York was already required to render. In short it is argued that a fee percentage which may have been reasonable when the Fund was freshly-launched became unreasonable when the Fund grew to its present huge size. See, e.g., Fogel v. Chestnutt, 668 F.2d 100, 111 (2d Cir.1981), cert. denied, --- U.S. ----, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982).
 
 
 13
 In support of their advocacy of a "reasonableness" standard as the test by which a fiduciary's conduct under Sec. 36(b) should be governed, appellants point to excerpts from the Act's tortuous legislative history, just as the district court relied on other portions of the same history apparently rejecting that criterion in favor of a "breach of fiduciary duty" standard. The legislative history contains statements of legislators and legislative reports pointing in both directions. Bills introduced in 1967 and 1968, which would have imposed a "reasonableness" test, failed of passage. See H.R. 9510, H.R. 9511, and S. 1659, 90th Cong., 1st Sess. (1967) and S. 3724, 90th Cong., 2d Sess. (1968). When the mutual fund industry objected to this standard, a bill (S. 2224) was introduced in 1969 containing Sec. 36(b) in its present form, which was enacted in 1970. The Senate Report on the bill and the House Committee Report accompanying the companion bill do not define the term "fiduciary duty" as used in the bill or how it was to be distinguished from the term "reasonable" that had been used in predecessor bills. See Investment Company Amendments Act of 1970, S.Rep.No. 91-184, 91st Cong., 2d Sess. (1970), reprinted in [1970] U.S.Code Cong. & Ad.News 4897, and Investment Company Amendments Act of 1970, H.R.Rep. No. 91-1382, 91st Cong., 2d Sess. (1970). The Senate Report does state that an adviser-manager would not be precluded from earning a profit on services provided by it to a fund, that a "cost-plus" type of contract is not required, and that the court is not authorized "to substitute its business judgment for that of a mutual fund's board of directors in the area of management fees," id. at 4902-03. On the other hand, the same Report states that a "corporate waste" standard would be "unduly restrictive," [1970] U.S.Code Cong. & Ad.News at 4901, and Congressman Moss, Chairman of the Committee on Interstate and Foreign Commerce, who was one of the chief sponsors of Sec. 36(b), explained to the House that "[t]his [bill], by imposition of the fiduciary duty, would in effect require a standard of reasonableness in the charges," 116 Cong.Rec. 33281 (Sept. 23, 1970). Thus there was no attempt to set forth a definitive test by which observance or breach of fiduciary duty was to be determined.
 
 
 14
 In short, the legislative history of Sec. 36(b) indicates that the substitution of the term "fiduciary duty" for "reasonable," while possibly intended to modify the standard somewhat, was a more semantical than substantive compromise, shifting the focus slightly from the fund directors to the conduct of the investment adviser-manager. As the district court and all parties seem to recognize, the test is essentially whether the fee schedule represents a charge within the range of what would have been negotiated at arm's-length in the light of all of the surrounding circumstances. (Gartenberg Br. 15, 23, 24; Merrill Lynch Br. 27; Judge Pollack's opinion, 528 F.Supp. at 1047.) The Senate recognized that as a practical matter the usual arm's length bargaining between strangers does not occur between an adviser and the fund, stating:
 
 
 15
 "Since a typical fund is organized by its investment adviser which provides it with almost all management services and because its shares are bought by investors who rely on that service, a mutual fund cannot, as a practical matter sever its relationship with the adviser. Therefore, the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy." S.Rep. No. 91-184, supra, [1970] U.S.Code Cong. & Ad.News at 4901.
 
 
 16
 To be guilty of a violation of Sec. 36(b), therefore, the adviser-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining. Fogel v. Chestnutt, supra, 668 F.2d at 112 (2d Cir.1981), cert. denied, --- U.S. ----, 103 S.Ct. 65, 74 L.Ed.2d ---- (Oct. 5, 1982); In re Gartenberg, 636 F.2d 16, 18 (2d Cir.1980), cert. denied, 451 U.S. 910, 101 S.Ct. 1979, 68 L.Ed.2d 298 (1981). To make this determination all pertinent facts must be weighed.
 
 
 17
 We disagree with the district court's suggestions that the principal factor to be considered in evaluating a fee's fairness is the price charged by other similar advisers to funds managed by them, that the "price charged by advisers to those funds establishes the free and open market level for fiduciary compensation," that the "market price ... serves as a standard to test the fairness of the investment advisory fee," and that a fee is fair if it "is in harmony with the broad and prevailing market choice available to the investor," 528 F.Supp. at 1049, 1067-68. Competition between money market funds for shareholder business does not support an inference that competition must therefore also exist between adviser-managers for fund business. The former may be vigorous even though the latter is virtually non-existent. Each is governed by different forces. Reliance on prevailing industry advisory fees will not satisfy Sec. 36(b).
 
 
 18
 We do not suggest that rates charged by other adviser-managers to other similar funds are not a factor to be taken into account. Indeed, to the extent that other managers have tended "to reduce their effective charges as the fund grows in size," the Senate Committee noted that such a reduction represents "the best industry practice [which] will provide a guide," S.Rep. No. 91-184, supra, [1970] U.S.Code Cong. & Ad.News at 4902. However, the existence in most cases of an unseverable relationship between the adviser-manager and the fund it services tends to weaken the weight to be given to rates charged by advisers of other similar funds. Report of the Securities and Exchange Commission on the Public Policy Implications of Investment Company Growth, H.R.Rep. No. 2337, 89th Cong., 2d Sess. (1966) 131, 148.[2] A fund cannot move easily from one adviser-manager to another. Therefore "investment advisers seldom, if ever, compete with each other for advisory contracts with mutual funds." Id. at 126.
 
 
 19
 One reason why fund competition for shareholder business does not lead to competition between adviser-managers for fund business is the relative insignificance of the adviser's fee to each shareholder. The fund customer's shares of the advisory fee is usually too small a factor to lead him to invest in one fund rather than in another or to monitor adviser-manager's fees. "Cost reductions in the form of lower advisory fees ... do not figure significantly in the battle for investor favor." Id. Hence money market funds do not generally advertise that their advisory fees may be lower than those charged by advisers to other funds. The disparity is competitively insignificant. In the present case, for instance, the alleged excessive Manager's fee amounts to $2.88 a year for each $1,000 invested. If rates charged by the many other advisers were an affirmative competitive criterion, there would be little purpose in Sec. 36(b). Congress, however, recognized that because of the potentially incestuous relationships between many advisers and their funds, other factors may be more important in determining whether a fee is so excessive as to constitute a "breach of fiduciary duty." These include the adviser-manager's cost in providing the service, the nature and quality of the service, the extent to which the adviser-manager realizes economies of scale as the fund grows larger, and the volume of orders which must be processed by the manager. The legislative history of Sec. 36(b) makes clear that Congress
 
 
 20
 "intended that the court look at all the facts in connection with the determination and receipt of such compensation, including all services rendered to the fund or its shareholders and all compensation and payments received, in order to reach a decision as to whether the adviser has properly acted as a fiduciary in relation to such compensation." S.Rep. No. 91-184, supra, [1970] U.S.Code Cong. & Ad.News at 4910.
 
 
 21
 As the district court recognized, the expertise of the independent trustees of a fund, whether they are fully informed about all facts bearing on the adviser-manager's service and fee, and the extent of care and conscientiousness with which they perform their duties are important factors to be considered in deciding whether they and the adviser-manager are guilty of a breach of fiduciary duty in violation of Sec. 36(b). But even if the trustees of a fund endeavored to act in a responsible fashion, an adviser-manager's fee could be so disproportionately large as to amount to a breach of fiduciary duty in violation of Sec. 36(b). Moreover, an intent to defraud need not be proved to establish a violation. Section 36(b)(1), 15 U.S.C. Sec. 80a-35(b)(1), expressly relieves the plaintiffs of the necessity of alleging or proving that any defendant engaged in personal misconduct.
 
 
 22
 Nor do we subscribe to the district court's suggestion, 528 F.Supp. at 1044, that because Sec. 36(b) was adopted in response to public concern over fees charged to investors in front-end load equity funds, the standard for determining whether there has been a breach of duty in avoiding excessive fees should be different or lower for managers of no-load money market funds, which are a recent, post-statute phenomenon. A potential for abuse of fiduciary relationship regarding fees charged for management and advisory services exists with respect to both types of fund since the adviser-manager's fee remains insignificant to each shareholder, whether or not a load factor inhibits redemption of shares.[3]
 
 
 23
 Application of the foregoing standards to this case confirms that plaintiffs have failed to meet their burden of proving that the fees charged by the Manager to the Fund were so excessive or unfair as to amount to a breach of fiduciary duty within the meaning of Sec. 36(b). There is no evidence that the services rendered by the Manager have not been of the highest quality, bringing to bear the expertise and facilities of the huge, far-flung Merrill Lynch organization. The average investor in the Fund, while not realizing the highest possible yield for his investment, has enjoyed a better-than-average return.
 
 
 24
 The substantial increase in the Manager's fee, from $1,578,476 in 1977 to $39,369,587 for the year ending June 1981, resulted from the tremendous increase in the size of the Fund, from $428 million to over $19 billion during the same period. This increase multiplied the number of customers, daily transactions and other activities which the Manager and the Merrill Lynch organization handled as part of the service for the fee, thereby increasing costs proportionately. The orders processed annually by the Manager for the Fund increased from 2,486,782 in 1979 to 6,096,537 for the 12-month period ending June 30, 1981. Appellants' contention that since the Manager's own administrative expenses did not increase proportionately during the period after 1978, its profit margin was 96% for the 12-month period ending September 30, 1981, is unrealistic and was properly rejected by the district court. Proceeding on the erroneous theory that only the administrative costs incurred by the Manager itself may be considered, appellants ignore the heavy costs incurred by other Merrill Lynch affiliates in processing the increased volume of purchases and redemptions of Fund shares which were under the Manager's guidance. Since the Manager and Broker were divisions of one economic unit, the district court was entitled to deduct these costs in calculating the Manager's net profits. To limit consideration to the Manager's own administrative expenses would be to exalt form over substance and disregard the expressed Congressional intent that "all the facts in connection with the determination and receipt of such compensation" be considered.
 
 
 25
 Although the court reduced the after-tax profits by determining the Manager's tax liability before deducting the processing costs, deduction of the costs before determining after-tax liability would nevertheless result in profits that could hardly be labelled so excessive as to constitute a breach of fiduciary duty. For instance, when processing costs are deducted before determining tax liability, the Manager's fee of $39,369,587 for the year ending June 30, 1981, would result in a 38.4% after-tax profit if the Fitz-Gerald estimate of processing costs were adopted, 9.8% after-tax profit under the Diemer estimate and a $7.7 million loss under the PMM estimate.[4] No cost studies showing a higher after-tax profit were offered by appellants, who had the burden of proof. Moreover, after good-faith bargaining at arm's length between the 6 independent Fund trustees and the Manager, the latter's rate was graduated downward to reflect the economies that might be realized from the increase in value of the net assets. In view of these circumstances we cannot label clearly erroneous the district court's finding that no breach of fiduciary duty was shown.
 
 
 26
 Faced with these facts appellants respond that the Fund and the Manager, by having the processing of purchasing and redemption orders done by the Broker, were wastefully duplicating the services of its transfer agent, the Bank of New York, which was obligated, among its other duties, to accept Fund purchase and redemption orders. For these services the Bank of New York charged the Fund $13 per shareholder's account per year regardless of the number of transactions. For its services as transfer agent in the year 1980 the bank received $12,404,444 from the Fund. The services rendered to shareholders by the Merrill Lynch organization, however, greatly exceeded those that could be furnished by the Bank of New York, which performs the duties required of it as Transfer Agent under its agreement with the Fund at only one main office located in New York City. Purchasers of shares are attracted to the Fund by the convenience and flexibility of the huge Merrill Lynch Broker's organization with its network of over 400 offices and 7,000 account executives in the United States alone. A simple telephone call or visit by a Fund customer to an account executive in the nearest Merrill Lynch branch office is all that is needed to effectuate in-person Fund services. Most of the transactions through the bank, on the other hand, apparently are effectuated by mail or wire and involve other complications. Thus, although customers could open Fund accounts through the Bank of New York, approximately 80% of the 1980 Fund purchase and redemption orders were initiated through the Broker and approximately 99% of the half-million new Fund accounts in 1980 were opened through the Broker's branch office system. If the Fund did not have the Broker's network to provide the in-person services sought by customers and to handle the millions of orders executed annually but instead were restricted to use of the limited facilities of the Bank of New York, it would be unable to function effectively at its present high-volume level. There is no evidence that the Bank of New York is prepared to expand its location and services to the level provided by the Broker.
 
 
 27
 A more serious problem is posed by appellants' claim that in negotiating the Manager's fee the Merrill Lynch Fund and Manager failed to take into account that the Merrill Lynch Broker has gained large "fall-out" financial benefits annually in the form of commissions on non-Fund securities business generated by Fund customers and interest income on funds (known as the "float") held by the Broker from the date when a redemption check is issued by the Fund to its customer until the date it clears. If these benefits were taken into consideration, the argument goes, they would constitute a very substantial offset calling for a lower fee to the Manager than that paid by the Fund. Therefore, appellants contend, the Manager and the Fund, by failing to offset these benefits, were guilty of a breach of fiduciary duty in violation of Sec. 36(b).
 
 
 28
 The record reveals that a large percentage of persons who opened accounts with the Broker as Fund customers, e.g., some 38% of those who opened such accounts in the third quarter of 1979, later did some non-Fund business with Merrill Lynch, generating commissions for the Broker. Robert Diemer, the Broker's Director of Financial Services, testified that processing of Fund accounts helped to attract new equity security business which increased the Broker's commission revenue. These benefits to an affiliate in the Merrill Lynch organization, to the extent quantifiable, should be taken into account in determining whether the Manager's fee meets the standard of Sec. 36(b). Although the independent trustees may have been aware of these benefits, we are unpersuaded by the district court's suggestion that they cannot be measured or quantified because of inability to determine "whether customers who normally did an above-average level of brokerage business also tended to have Fund accounts" or to ascertain "what portion of the [increased brokerage business] would ... have gone to Merrill Lynch in any event." It would not seem impossible, through use of today's sophisticated computer equipment and statistical techniques, to obtain estimates of such "fall-out" and "float benefits" which, while not precise, could be a factor of sufficient substance to give the Funds' trustees a sound basis for negotiating a lower Manager's fee. However, the burden was on appellants, not the defendants, to adduce evidence demonstrating that the benefits were so substantial that they rendered the Manager's fee so disproportionately large as to label its negotiation a "breach of fiduciary duty" within the meaning of Sec. 36(b). Since appellants failed to offer such evidence, the dismissal of their contention must be affirmed.
 
 
 29
 Since the district court properly took into consideration the fact that the Merrill Lynch organization's costs of processing Fund orders are substantial and the record fails to show that the Manager's profits were so disproportionately large as to amount to a breach of fiduciary duty, we find no merit in appellants' further argument that the Manager violated Sec. 36(b) by failing to disclose to the Fund's trustees relevant cost information and potential benefits. As Judge Pollack found, the Trustees were aware of or could obtain the essential facts needed to negotiate a reasonable fee. Similarly the Fund stockholders, before approving the management agreement between the Manager and the Fund, were made aware through proxy materials that the non-affiliated Fund trustees, who were the shareholders' watchdog representatives, Burks v. Lasker, 441 U.S. 471, 484-85, 99 S.Ct. 1831, 1840-41, 60 L.Ed.2d 404 (1979), had considered extensive relevant information before continuing in effect the Fund's agreement with the Manager. Since the trustees have the primary responsibility under the Act, Sec. 36(b) does not require that the Fund shareholders be furnished with additional information over and above that provided.
 
 
 30
 Our affirmance is not a holding that the fee contract between the Fund and the Manager is fair and reasonable. We merely conclude that on this record appellants failed to prove by a preponderance of the evidence a breach of fiduciary duty. Whether a violation of Sec. 36(b) might be established through more probative evidence of (1) the Broker's processing costs, (2) the offsetting commission benefits realized by the Broker from non-Fund securities business generated by Fund accounts, and (3) the "float" interest income gained by the Broker from its method of handling payment on Fund redemptions, must therefore remain a matter of speculation. Indeed, the independent trustees of the Fund might well be advised, in the interests of Fund investors, to initiate such studies.
 
 
 31
 The only claim alleged by appellants in their complaints and tried to the district court was that defendants were guilty of breach of fiduciary duty by paying the Manager excessive compensation in violation of Sec. 36(b). Following trial and on this appeal appellants have sought to expand this claim to include charges that the defendants violated other provisions of the Act, Secs. 15(a)-(c) and 20(a), 15 U.S.C. Secs. 80a-15(a)-(c) and 20(a).[5] Appellants' Proposed Findings of Fact and Conclusions of Law, even after updating, did not refer to these additional alleged violations of other sections of the Act. The belated post-trial attempt to add these claims was apparently motivated by plaintiffs' desire to avoid the one-year statute of limitations applicable to actions under Sec. 36(b). We accordingly affirm the district court's dismissal of these purported additional claims as not having been presented to the district court for adjudication. In any event, for the reasons already expressed by us and the additional reasons stated by the district court in its discussion of these additional claims "for the sake of completeness," 528 F.Supp. at 1066-67, they are meritless.
 
 
 32
 The judgment of the district court is affirmed.
 
 
 
 [1]
 Section 36(b) provides in pertinent part:
 "Sec. 80a-35. Breach of fiduciary duty--Civil actions by Commission; jurisdiction; allegations; injunctive or other relief
 * * *
 "Compensation or payments as basis of fiduciary duty; civil actions by Commission or security holder; burden of proof; judicial consideration of director or shareholder approval; persons liable; extent of liability; exempted transactions; jurisdiction; finding restriction
 "(b) For the purposes of this sub-section, the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment adviser, or any affiliated person of such investment adviser, or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments, for breach of fiduciary duty in respect of such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person. With respect to any such action the following provisions shall apply:
 "(1) It shall not be necessary to allege or prove that any defendant engaged in personal misconduct, and the plaintiff shall have the burden of proving a breach of fiduciary duty.
 "(2) In any such action approval by the board of directors of such investment company of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, and ratification or approval of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, by the shareholders of such investment company, shall be given such consideration by the court as is deemed appropriate under all the circumstances."
 This Circuit has recently held that the demand requirement of F.R.Civ.P. 23.1 does not apply to lawsuits brought under Sec. 36(b). See Fox v. Reich & Tang, Inc., 692 F.2d 250 (2d Cir.1982).
 
 
 [2]
 The following statement in the Report of the Securities and Exchange Commission on The Public Policy Implications of Investment Company Growth, while directed to mutual funds, is pertinent to money market funds:
 "It has been the Commission's experience in the administration of the Act that in general the unaffiliated directors have not been in a position to secure changes in the level of advisory fee rates in the mutual fund industry. In most instances the adviser serves as, or is closely affiliated with, the fund's principal underwriter which maintains a distributing organization for the fund's shares. The organization that has developed over a period of years to manage the fund's portfolio and to furnish it with some, and in certain cases virtually all, of the nonadvisory services necessary to its operation belongs to the adviser and not to the fund. Indeed, in some cases all of the fund's records are maintained by the fund's adviser. Although the unaffiliated directors under State law have an unqualified right of access to these records, the adviser, as a practical matter, is in a position to seriously hamper any employment of that right which might interfere with or threaten the adviser's operation of or control over the fund.
 "Thus, negotiations between the unaffiliated directors and fund advisers over advisory fees would lack an essential element of arm's-length bargaining--the freedom to terminate the negotiations and to bargain with other parties for the same services. In view of the fund's dependence on its existing adviser and the fact that many shareholders may have invested in the fund on the strength of the adviser's reputation, few unaffiliated directors would feel justified in replacing the adviser with a new and untested organization simply because of difficulty in obtaining a reduction in long-established fee rates which are customary in the industry." H.R.Rep.No. 2337, 89th Cong., 2d Sess. 131 (1966).
 
 
 [3]
 Appellants' argument that the lower fees charged by investment advisers to large pension funds should be used as a criterion for determining fair advisory fees for money market funds must also be rejected. The nature and extent of the services required by each type of fund differ sharply. As the district court recognized, the pension fund does not face the myriad of daily purchases and redemptions throughout the nation which must be handled by the Fund, in which a purchaser may invest for only a few days
 
 
 [4]
 These percentages were arrived at by the following calculations:
 Using Using
 Fitz-Gerald Diemer Using PMM
 Estimate of Estimate of Estimate of
 Processing Processing Processing
 Costs Costs Costs
ADVISER'S FEE $39,369,587 $39,369,587 $39,369,587
 Less direct
 costs 1,567,847 1,567,847 1,567,847
 Less processing
 costs 10,534,805 30,848,477 45,541,131
 ----------- ----------- ------------
PRE-TAX
 PROFIT (LOSS) 27,266,935 6,953,263 (7,739,391)
 Less tax at
 44.5% 12,133,786 3,094,202 -- --
 AFTER TAX
 PROFIT 15,133,149 3,859,061 -- --
 PERCENTAGE
 OF ADVISER'S FEE
 THAT GOES TO
 AFTER-TAX
 PROFIT 38.4% 9.8% -- --
 See 528 F.Supp. at 1038 for the source of the cost figures. Merrill Lynch & Co. allocates its overall tax liability to its subsidiaries, including the Fund; the overall Merrill Lynch 1980 tax rate of 44.5% has therefore been applied to all of these profit figures.
 Appellants' contention that the PMM cost study improperly included selling or distribution expenses that may not be taken into consideration in determining whether the Manager's fee was excessive, see SEC Rule 12b-1, 17 C.F.R. Sec. 270.12b-1, must be rejected, since the latter is limited to promotional expenses (e.g., advertising, sales literature) designed to create new sales of no benefit to existing shareholders and the record reveals no such promotion of Fund sales by the Merrill Lynch organization.
 
 
 [5]
 "Sec. 80a-15. Contracts of advisers and underwriters
 "(a) It shall be unlawful for any person to serve or act as investment adviser of a registered investment company, except pursuant to a written contract, which contract, whether with such registered company or with an investment adviser of such registered company, has been approved by the vote of a majority of the outstanding voting securities of such registered company, and--
 (1) precisely describes all compensation to be paid thereunder;
 (2) shall continue in effect for a period more than two years from the date of its execution, only so long as such continuance is specifically approved at least annually by the board of directors or by vote of a majority of the outstanding voting securities of such company;
 (3) provides, in substance, that it may be terminated at any time, without the payment of any penalty, by the board of directors of such registered company or by vote of a majority of the outstanding voting securities of such company on not more than sixty days' written notice to the investment adviser; and
 (4) provides, in substance, for its automatic termination in the event of its assignment.
 "(b) It shall be unlawful for any principal underwriter for a registered open-end company to offer for sale, sell, or deliver after sale any security of which such company is the issuer, except pursuant to a written contract with such company, which contract--
 (1) shall continue in effect for a period more than two years from the date of its execution, only so long as such continuance is specifically approved at least annually by the board of directors or by vote of a majority of the outstanding voting securities of such company; and
 (2) provides, in substance, for its automatic termination in the event of its assignment.
 "(c) In addition to the requirements of subsections (a) and (b) of this section, it shall be unlawful for any registered investment company having a board of directors to enter into, renew, or perform any contract or agreement, written or oral, whereby a person undertakes regularly to serve or act as investment adviser of or principal underwriter for such company, unless the terms of such contract or agreement and any renewal thereof have been approved by the vote of a majority of directors, who are not parties to such contract or agreement or interested persons of any such party, cast in person at a meeting called for the purpose of voting on such approval. It shall be the duty of the directors of a registered investment company to request and evaluate, and the duty of an investment adviser to such company to furnish, such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such company...."
 "Sec. 80a-20. Proxies; voting trusts; circular ownership
 "(a) It shall be unlawful for any person, by use of the mails or any means or instrumentality of interstate commerce or otherwise, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security of which a registered investment company is the issuer in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."