Richard T. KRANTZ, Plaintiff,

v.

FIDELITY MANAGEMENT & RE-
SEARCH, COMPANY, Fidelity Dis-
tributors Corporation, and FMR
Corp., Defendants.

No. CivA 98–11988–PBS.

United States District Court,
D. Massachusetts.

May 31, 2000.

Susan E. Stenger, Perkins, Smith & Cohen, Boston, MA, Jeffrey M. Haber, Joel C. Feffer, Stuart D. Wechsler, Wechsler, Harwood, Halebian & Feffer, LLP, New York City, for Richard T. Krantz, plaintiff.

James S. Dittmar, David A. Forman, Hutchins, Wheeler & Dittmar, Boston, MA, for Fidelity Management & Research Company, defendant.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### I. *Introduction*

Plaintiff Richard T. Krantz, a shareholder in two Fidelity mutual funds, claims that the directors are under the control of the investment adviser in violation of §§ 10(a), 15(c) and 36(a) of the Investment Company Act of 1940 (the "ICA" or the "Act"), *as amended,* 15 U.S.C. §§ 80a–1 et seq., and that the investment adviser's fees are excessive under § 36(b) of the ICA.[1] The linchpin of these claims is that the same nine "independent" directors serve on the twelve-person boards of all 237 Fidelity investment companies and receive substantial annual salaries ranging from

---

1. The plaintiff's verified amended complaint asserts: a claim under §§ 10(a) and 15(c) (Count I); a claim under § 36(a) (Count II); and an excessive fees claim under § 36(b) (Count III).

$220,500 to $273,500. Plaintiff seeks to recover the "excessive compensation" received by defendants pursuant to agreements with the two funds.

The defendants move to dismiss the amended complaint pursuant to Fed. R.Civ.P. 12(b)(6), arguing that allegations of multiple board membership and substantial compensation—absent other indicia of control—are insufficient to support inferences that the directors are controlled by the funds' investment adviser or that the fees are excessive. After hearing, the defendants' motion to dismiss is **ALLOWED** except with respect to the last count alleging excessive investment adviser's fees.

## II. *Facts*

When all reasonable inferences are drawn in favor of the nonmoving party, the amended complaint alleges the following facts (many of which are disputed by defendants).

The plaintiff is a shareholder in two Fidelity mutual funds ("Two Funds"), the Fidelity Equity–Income II Fund and the Fidelity Value Fund. The defendants are the investment adviser to the Fidelity group of mutual funds, Fidelity Management and Research Company; the underwriter of the funds, Fidelity Distributors

Corporation; and Fidelity's parent company, FMR Corporation (collectively "Fidelity").[2]

Nine members of the twelve-person boards within the Fidelity fund complex serve on the boards of all of Fidelity's 237 investment companies and each receives a substantial annual salary ranging from $220,500 to $273,500. Their compensation exceeds the amounts paid to other, similarly situated trustees. Most of these "independent" trustees have other full-time employment as well as directorial positions.[3] They were all appointed by the defendants, and as a "practical matter," according to the amended complaint, they serve "at the pleasure" of the defendants. Fidelity has designated these directors as independent, that is, not affiliated with, or controlled by defendants. The prospectus for each of the Two Funds states: "The trustees serve as trustees for other Fidelity Funds. The majority of trustees are not otherwise affiliated with Fidelity."

As evidence of the trustees' lack of disinterestedness, the amended complaint asserts that the trustees failed to oppose defendants in the following respects. *First,* although three funds within the 237 fund complex have performed abysmally, the trustees have never replaced FMR.

---

**2.** The original complaint in this action was filed on September 30, 1998, and the defendants moved to dismiss the complaint on January 11, 1999. The Court heard oral argument on April 28, 1999, and on the following day, plaintiff moved to amend the complaint. Plaintiff filed an amended complaint on June 14, 1999, and on August 6, 1999, the defendants again moved to dismiss.

**3.** The complaint describes the directors as follows: 1. Ralph A. Cox is president of a management consulting firm, and a director of USA Waste Services, Inc., CH2M Hill Companies, Rio Grande, Inc., and Daniel Industries; 2. Phyllis Burke Davis is a director of BellSouth Corporation, Eaton Corporation, and TJX Companies, Inc.; 3. Robert M. Gates is a consultant, author, and lecturer and a director of LucasVarity PLC, Charles Stark Draper Laboratory, NACCO Industries, Inc., and TRW Inc.; 4. E. Bradley Jones is a director of TRW Inc., Consolidated Rail Corpo-

ration, Birmingham Steel Corporation, and RPM, Inc.; 5. Donald J. Kirk holds an academic position and is a financial consultant; 6. William O. McCoy is an officer of a large university and a director of Liberty Corporation, Weeks Corporation of Atlanta, Carolina Power and Light Company, and Kenan Transport Co.; 7. Gerald C. McDonough is Chairman of a strategic advisory services firm and a director of York International Corp., Commercial Intertech Corp., CUNO, Inc., and Associated Estates Realty Corporation; 8. Marvin L. Mann is chairman of Lexmark International, Inc. and a director of M.A. Hanna Company and Imation Corp.; and 9. Thomas R. Williams is president of a management and financial advisory services firm and a director of ConAgra, Inc., Georgia Power Company, National Life Insurance Company of Vermont, American Software, Inc., and AppleSouth, Inc.

*Second,* the trustees have never considered internalizing the Two Funds' management. *Third,* the trustees have permitted FMR to receive and retain compensation from the broker-dealers who execute portfolio transactions for the Two Funds (i.e. soft dollars), and as a result have caused the Two Funds to pay higher commissions than they otherwise would have. "Soft dollar" arrangements are the packaging of research services fees with brokerage commissions by investment advisers. The adviser often receives a "rebate" as a part of the packaged deal. These practices increased the average commission rate per share for the Two Funds from 1996 to 1997, and resulted in an excessive volume of portfolio transactions.

The amended complaint also asserts that the adviser's fees are excessive. The adviser to the Two Funds is compensated at a rate of .49% of Fidelity Equity–Income II's net assets, and at a rate of .41% of Fidelity Value Fund's net assets. In comparison, a 1962 Wharton School study described the market rate of .5% of net assets as excessive.

Plaintiff also alleges that the defendants did not pass along savings to investors that Fidelity realized from economies of scale and better computer technology. To demonstrate the new scale of the funds, the plaintiff states that, in 1985, the entire fund complex had $35.8 billion in assets under management, and defendants received 1.085% of those funds, or $388.6 million, whereas in 1995, the fund complex's assets increased to $373.3 billion, and the management fee also increased to 1.146% of those assets, or $4.3 billion.

Finally, the complaint alleges that the Fidelity Value Fund performed poorly in 1998 as compared to its peer funds and the S & P 500. The Fidelity Value Fund reported a negative return in 1998 of 12.25%. The amended complaint does not mention the Fidelity Equity–Income II Fund's performance.

## III. *Discussion*

### A. *Pleading Standard*

For the purposes of a motion to dismiss, all well-pleaded allegations are accepted as true, and the plaintiff is given the benefit of all reasonable inferences. *See Cooperman v. Individual, Inc.,* 171 F.3d 43, 46 (1st Cir.1999). "Dismissal under Fed. R.Civ.P. 12(b)(6) is only appropriate if the complaint, so viewed, presents no set of facts justifying recovery." *Id.* (citing *Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 16 (1st Cir.1989)). "[T]he Federal Rules of Procedure do not require a claimant to set out in detail the facts upon which he bases his claim." *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). However, "it is only when conclusions are logically compelled, or at least supported, by the stated facts, that is, when the suggested inference rises to what experience indicates is an acceptable level of probability, that 'conclusions' become 'facts' for pleading purposes." *Cooperman,* 171 F.3d at 47–48. "Conclusory allegations in a complaint, if they stand alone, are a danger sign that the plaintiff is engaged in a fishing expedition." *DM Research v. College of Am. Pathologists,* 170 F.3d 53, 55 (1st Cir.1999).

### B. *Multiple Board Membership*

The ICA establishes a scheme designed to address potential conflicts of interests inherent in the management of investment companies which provide mutual fund services and "typically are organized and underwritten by the same firm that serves as the company's 'investment adviser.' " *Kamen v. Kemper Fin. Serv., Inc.,* 500 U.S. 90, 93, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991). Among other things, the Act requires that at least forty percent of an investment company's directors be financially independent of the investment adviser. *See* 15 U.S.C. §§ 80a–10(a) & 80a–

2(a)(19)(A). Specifically, Section 10(a) provides:

> No registered investment company shall have a board of directors more than 60 per centum of the members of which are persons who are interested persons of such registered company.

15 U.S.C. § 80a–10(a). This provision is the "cornerstone of the ICA's effort to control conflicts of interest within the mutual funds." *Burks v. Lasker*, 441 U.S. 471, 482, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979). Its purpose is "to place unaffiliated directors in the role of 'independent watchdogs,'" who would "furnish an independent check upon the management of investment companies." *Id.* at 484, 99 S.Ct. 1831 (citations omitted).

The term "interested person" is defined to include "any affiliated person" of an investment company, investment adviser, or principal underwriter. *See* 15 U.S.C. § 80a–2(a)(19)(A)(i) & (B)(i). The term "affiliated person", in turn, is defined to include "any person directly or indirectly ... controlled by ... such other person." *Id.* § 80a–2(a)(3)(C). The Act defines "control" as "the power to exercise a controlling influence over the management or policies of a company, unless such power is solely the result of an official position with such company." *Id.* § 80a–2(a)(9). The statute expressly creates a presumption against control: "[a] natural person shall be presumed not to be a controlled person within the meaning of this subchapter." *Id.* The statute states that any such presumption may be rebutted by "evidence," *id.*, but it does not state what kind. Any agreement entered into by an investment company must be approved by a majority of these independent directors. *See id.* § 80a–15(c).[4] Section 36(a)[5] has been construed to provide a cause of action against any director who engages in an act "constituting a breach of fiduciary duty involving personal misconduct." *Id.* § 80a–35(a).

Neither the ICA nor the SEC proscribes the use of interlocking boards within mutual fund complexes. Although the SEC does not regulate multi-board membership, it requires disclosure of the aggregate compensation received by directors who serve on multiple fund boards. *See* Amendments to Proxy Rules for Registered Investment Companies, Investment Company Act Release No. IC–20614 (Oct.

---

**4.** 15 U.S.C. § 80a–15(c) states in relevant part:

> [I]t shall be unlawful for any registered investment company having a board of directors to enter into, renew, or perform any contract or agreement, written or oral, whereby a person undertakes regularly to serve or act as investment adviser of or principal underwriter for such company, unless the terms of such contract or agreement and any renewal thereof have been approved by the vote of a majority of directors, who are not parties to such contract or agreement or interested persons of any such party, cast in person at a meeting called for the purpose of voting on such approval.

**5.** Section 36(a) provides:

> The Commission is authorized to bring an action in the proper district court of the United States, or in the United States court of any territory or other place subject to the jurisdiction of the United States, alleging that a person serving or acting in one or more of the following capacities has engaged within five years of the commencement of the action or is about to engage in any act or practice constituting a breach of fiduciary duty involving personal misconduct in respect of any registered investment company for which such person so serves or acts—
>
> (1) as officer, director, member of any advisory board, investment adviser, or depositor; or
>
> (2) as principal underwriter, if such registered company is an open-end company, unit investment trust, or face-amount certificate company.
>
> If such allegations are established, the court may enjoin such persons from acting in any or all such capacities either permanently or temporarily and award such injunctive or other relief against such person as may be reasonable and appropriate in the circumstances, having due regard to the protection of investors and to the effectuation of the policies declared in section 80a–1(b) of this title.

15 U.S.C. § 80a–35(a).

13, 1994), *available in* 1994 WL 562028 (S.E.C.), at *3–4.

The pivotal issue is whether well-compensated service by non-employee directors on multiple boards of mutual funds within a fund complex managed by a single fund adviser can, in some circumstances, rebut the statutory presumption of non-control and render the directors "interested" persons within the meaning of the ICA. Essentially, plaintiffs press the view that mutual fund directors can never truly be disinterested when they serve on multiple boards and are paid well.

■ Courts have looked at various factors to determine whether directors are controlled persons. *First,* the mere fact that a director is compensated, even handsomely, for service does not constitute a disqualifying interest. *See Kamen v. Kemper Fin. Servs.,* 939 F.2d 458, 460 (7th Cir.1991). However, director compensation might be relevant if the investment adviser has the power to set, or even influence, the level of compensation received by the directors or remove them from office. *See Verkouteren v. Blackrock Fin. Management, Inc.,* 37 F.Supp.2d 256, 259 (S.D.N.Y.1999), *aff'd* 208 F.3d 204 (2d Cir. 2000) (table).

■ *Second,* allegations that non-employee directors failed to resist a course of action suggested by the investment adviser which prejudiced the funds' shareholders might serve as evidence to rebut the statutory presumption. *Id.* However, an allegation is insufficient if it "more plausibly suggests a dereliction of duty on the part of the outside directors than the fact that said directors are being 'controlled' by defendant." *Id.*

*Third,* while well-compensated membership on multiple boards within a fund complex is one factor in the control crucible, most courts have concluded that it is not sufficient evidence by itself to rebut the statutory presumption. *See id.* at 258–59 (rejecting a control claim where the complaint alleged service by "indepen-

dent directors" on twenty-one boards with compensation ranging from $140,000 to $160,000); *Krantz v. Prudential Invs. Fund Management LLC,* 77 F.Supp.2d 559, 563 (D.N.J.1999) (rejecting a claim that overlapping service on between 15 and 38 boards with an average compensation of $90,000 constituted control); *Langner v. Brown,* 913 F.Supp. 260, 266 (S.D.N.Y.1996) (holding that "[j]ust as the mere receipt of director fees does not constitute a disqualifying interest as a matter of law, so too are cross-directorships insufficient to create interests"); *Olesh v. Dreyfus Corp.,* No. CV–94–1664, 1995 WL 500491, at *21 (E.D.N.Y. Aug. 8, 1995) (holding that directors who sat on over fifteen boards and received over $50,000 in compensation were not interested.)

One court took a more jaundiced view of lucrative multiple directorships:

> Although multiple directorships are not necessarily determinative of a director's independence, either under the statute or the SEC's interpretations, where, as here, a director's actions are alleged to establish that he or she may be acting in the interests of the adviser, the receipt of substantial remuneration from a fund complex does call into question the director's independence from the manager of the complex.

*Strougo v. Scudder, Stevens & Clark, Inc.,* 964 F.Supp. 783, 795 (S.D.N.Y.1997) (excusing a demand on the board of directors as futile under Maryland law where three directors sat on between four and fifteen boards and made between $54,000 and $81,753), *reh'g denied,* No. 96–CIV–2136, 1997 WL 473566, at *5 (S.D.N.Y. Aug.18, 1997) (reiterating that "well-compensated service on multiple boards of funds managed by a single fund adviser can, in some circumstances, be indistinguishable in all relevant respects from employment by the fund manager which, admittedly renders a director interested"); *accord Strougo v. Bassini,* 1 F.Supp.2d 268, 273–75 (S.D.N.Y.1998) (refusing to dismiss for refusal to make a demand where all the

directors sat on between 5 and 9 boards and made $42,000).

■ The SEC has set forth factors relevant to a determination of control over directors: 1) selection or nomination of the director by the controlling party; 2) existence of family ties; 3) social relations; 4) former business associations between the director and the controlling person; 5) the amount of time spent by directors at meetings; 6) respective ages; 7) participation in recommending, evaluating and terminating policies; 8) independent knowledge of corporate affairs; 9) interlocking directors and officers, together with share ownership; and 10) actual domination and operation. *See First Australia Fund, Inc.,* SEC No–Action Letter, 1987 WL 108483 (S.E.C.) at *7, (Oct. 8, 1987). Recently, the SEC reaffirmed that "a director of a fund who also is a director of another fund managed by the same adviser generally would not be viewed as an interested person of the fund under Section 2(a)(19) solely as a result of this relationship." Interpretive Matters Concerning Independent Directors of Investment Companies, Investment Company Act Release No. IC–24083 (Oct. 14, 1999) (citing H.R.Rep. No. 1382, 91st Cong., 2nd Sess. 15 (1970); S.Rep. No. 184, 91st Cong., 1st Sess. 34 (1969)), *available in* 1999 WL 820629 (S.E.C.), at *6 & n. 40.

The SEC has proposed a rule that: (1) fund boards should have a majority of independent directors; (2) that independent directors should select and nominate any new independent directors; (3) the directors should have outside legal counsel to insure they get objective advice; and (4) fund shareholders should have more specific information on which to judge the independence of their funds' directors. *See* Role of Independent Directors of Investment Companies, Investment Company Act Release No. IC–24082 (Oct. 14, 1999) (proposing rule changes emphasizing disclosures to shareholders), *available in*

1999 WL 8260633 (S.E.C.), at *5. With respect to the last proposal, the SEC stated:

> [T]he Commission now is proposing to require disclosure of the total number of portfolios, rather than registered investment companies, that a director oversees. In today's environment, where a complex may choose between organizing a single series company with multiple portfolios or multiple investment companies each with a single portfolio, we believe that requiring disclosure of the number of portfolios that a director oversees would provide a more accurate picture of the director's responsibilities.

*Id.* at *19. The proposed rule does not include a prohibition against service on multiple boards.

■ Plaintiff makes three arguments to support his claim that the Fidelity directors are not disinterested. The first argument is semantic. He argues that the statement in the prospectus that the trustees serve as trustees for other Fidelity funds but are not "otherwise affiliated with Fidelity" amounts to an "admission" that the directors and the adviser are affiliated. This statement cannot reasonably be read as an admission of an affiliation as that term is defined in the ICA. Rather, it only admits the obvious—the majority of Fidelity directors serve on multiple boards within the Fidelity fund complex.

■ Second, Krantz relies on allegations that the directors' lack of disinterestedness is established by their refusal to resist actions of the investment adviser that allegedly prejudiced the shareholders. He criticizes the "soft dollar" arrangements that are being allowed to flourish at Fidelity unchecked by the directors. As defendants point out, "soft dollar" arrangements are permitted by securities law. *See* 15 U.S.C. § 78bb(e) (creating "safe harbor" for brokerage commissions that include research fees paid in good faith).[6]

---

**6.** The provision provides, in pertinent part:

No person ... in the exercise of investment discretion with respect to an account shall

Plaintiff has not alleged any improprieties in Fidelity's soft dollar arrangements, and he admitted at oral argument that he has no information regarding the extent of these arrangements. Also, his criticism of the refusal to ditch the investment adviser, or internalize management to save costs, because of the poor performance of three funds is unsound because apparently 234 Fidelity funds have fared well. Finally, his complaint about excessive compensation (discussed more fully in the next section) is insufficient to support an inference of control, rather than mere dereliction of duty.

The plaintiff's strongest argument is the extent of the Fidelity directors' multiplicity and compensation. The plaintiff's point is well-taken that the number of boards and the amount of the compensation involved in this case is more than four times larger than has been considered previously in reported cases. Nonetheless, I am persuaded by the majority view that the directors' well-compensated multiple board membership is insufficient to rebut the statutory presumption against control without other indicia of control. My conclusion is consistent with *Burks v. Lasker*, 441 U.S. 471, 480–86, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979), which eschews reliance on assumptions of partiality based on the structure of the governing board rather than the facts of an individual case. In *Burks*, the Supreme Court noted the view that mutual fund directors could "never be truly disinterested in suits involving their co-directors," 441 U.S. at 485 n. 15, 99 S.Ct. 1831, but continued:

> While lack of impartiality may or may not be true as a matter of fact in individual cases, it is not a conclusion of law required by the ICA. Congress surely would not have entrusted such control

functions as approval of advisory contracts and selection of accountants to the statutorily disinterested directors had it shared the Court of Appeals' view that such directors could never be "disinterested" where their co-directors or investment advisers were concerned.

*Id.* The Supreme Court predicated this analysis, in part, on the statutory presumption against control of a natural person in the ICA. *See* 15 U.S.C. § 80a–2(a)(9). Even the *Strougo* line of cases declines to rely solely on multiple board membership, but emphasizes the allegations of business decisions which so substantially prejudiced the shareholders to the benefit of the investment adviser that the court could reasonably draw an inference of control, rather than of poor business judgment or mere oversight.

While there is an allegation that the investment adviser appointed the directors (thus implicating SEC factor five), there is no allegation that the investment adviser sets the level of compensation or determines director retention or re-election, or actually controls the directors. Because the allegations in the Amended Complaint do not surmount the hurdle erected by the statutory presumption, plaintiff's claims under §§ 10(b), 15(c), 36(a) of the ICA are *DISMISSED.*

### C. *Excessive Advisory Fees*

Plaintiff's third count alleges that Fidelity's investment adviser charged excessive advisory fees in violation of the fiduciary obligations imposed by Section 36(b) of the ICA. An investment adviser has a "fiduciary duty with respect to the receipt of compensation." 15 U.S.C. § 80a–35(b). A shareholder has a direct private cause of action under § 36(b) against the investment adviser "for breach of fiduciary duty

---

be deemed to have acted unlawfully or to have breached a fiduciary duty under State or Federal law ... solely by reason of his having caused the account to pay ... an amount of commission for effecting a securities transaction in excess of the amount of commission another ... broker ... would

have charged for effecting that transaction, if such person determined in good faith that such amount of commission was reasonable in relation to the value of the brokerage and research services provided....

15 U.S.C. § 78bb(e)(1).

in respect of ... compensation" paid by a fund. *Id.*

■ A fee is excessive, and thus a breach of the investment adviser's fiduciary duty under § 36(b), if it is "so disproportionally large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Gartenberg v. Merrill Lynch Asset Management, Inc.,* 694 F.2d 923, 928 (2d Cir.1982) (dismissing derivative actions after a non-jury trial).

Although the First Circuit has not had occasion to set an excessive fees standard, two lower courts outside the Second Circuit have applied the *Gartenberg* standard. *See, e.g., Migdal v. Rowe–Price Fleming,* Civ. 98–2162, 1999 WL 104795, at *1 (D.Md. Jan.20, 1999); *King v. Douglass,* 973 F.Supp. 707, 722 (S.D.Tex.1996). The *Gartenberg* standard in an excessive fees case provides a comprehensive framework to analyze a claim of excessive fees. I will follow it here.

■ *Gartenberg* identified six factors to evaluate the disproportionality of an advisory fee: 1) the nature and quality of the services provided to fund shareholders; 2) the profitability of the fund to the adviser-manager; 3) economies of scale in operating the fund as it grows larger; 4) comparative fee structures; 5) fallout benefits, i.e., indirect profits to the adviser attributable in some way to the existence of the fund; and 6) the independence and conscientiousness of the directors. *See Krinsk v. Fund Asset Management,* 875 F.2d 404, 409 (2d Cir.1989) (citing *Gartenberg,* 694 F.2d at 929–30.)

At the pleading stage, a complaint must state more than a legal conclusion that a fee is excessive in order to survive a motion to dismiss. *See Levy v. Alliance Capital Management L.P.,* No. 97–Civ–4672, 1998 WL 744005, at *4 (S.D.N.Y. Oct.26, 1998) (dismissing § 36(b) claim against investment adviser because plaintiff failed to allege why a new advisory agreement's fees were excessive); *Strougo I,* 964

F.Supp. at 805 (holding that the allegation that the investment adviser's fee "increased substantially" as a result of a funds' rights offering to existing shareholders does not support an excessive fee claim under Section 36(b), although it might under Section 36(a)); *Wexler v. Equitable Management Corp.,* No. 93–Civ–3834, 1994 WL 48807, at *4 (S.D.N.Y. Feb.17, 1994) (dismissing a § 36(b) claim that alleged that fees would be excessive after the sale of the investment adviser).

Plaintiff alleges facts concerning four of the *Gartenberg* factors. *First,* the plaintiff argues that as the "natural consequence" of the failure of the Two Funds to have independent watchdog trustees, the agreements were not negotiated at arm's length and the fees are excessive. While membership on multiple boards does not necessarily establish lack of independence, it may support an inference of a lack of conscientiousness (*Gartenberg* factor 6) by the directors in reviewing the fees paid by each of the funds.

*Second,* with respect to the quality of services (*Gartenberg* factor 1), the plaintiff highlights the Fidelity Value Fund's poor performance in 1998—it reported a negative 12.25 per cent return while its peer funds and the S & P 500 reported substantial gains. *Cf. Strougo v. Bea Assoc.,* No. 98–Civ–3725, 2000 WL 45714, at *6 (S.D.N.Y.2000) (declining to dismiss a Section 36(b) claim because it is "impossible to say, as a matter of law, that a net adviser fee equal to 42.3% of a fund's total investment income in a given year, where such fund by any objective standard performed poorly in that year, is not disproportionately large enough to bear an unreasonable relationship to the services rendered by that adviser").

*Third,* to provide a factual basis for comparative fee structures (*Gartenberg* factor 4), the plaintiff compares the fee percentage rates of .41% and .49% for the Fidelity Equity–Income II Fund and the Fidelity Value Fund with the average "excessive" rate of .5% cited in the 1962

Wharton School study. This thirty-something year old comparison is not particularly meaningful given the absence of facts concerning the services provided by the funds covered in the study as compared to these funds, and the lack of allegations concerning *current* fee structures of competitors' funds.

*Lastly*, the plaintiff asserts that the defendants did not pass savings on to the funds' investors that Fidelity realized from economies of scale (*Gartenberg* factor 3) due to the enormous growth in assets under management as well as efficiencies caused by computer advances. Significantly, plaintiff alleges that between 1985 and 1995 the total revenues of defendants *increased* as a percentage of the mutual fund assets under management.[7] This factor weighs in favor of the disproportionality under *Gartenberg*.

Defendants argue vigorously that there are no factual allegations that support the other *Gartenberg* factors. There are no allegations concerning: the fees paid by the Value Fund in 1998 or in any other year; changes in the Value Fund fee structure as a result of its performance; or how the Value Fund's fees compare with fees paid by other funds for similar services. The plaintiff alleges in his complaint that he cannot make more specific allegations about the Two Funds and must rely on aggregate numbers because defendants are not publicly owned corporations and more specific financial information is not available prior to discovery. Counsel reiterated this point at oral argument, stating that he could not find out what the fee structures for the Two Funds were. Although defendants hotly dispute this claim that they control the information relevant to a *Gartenberg* analysis, the court has no basis in the record for discrediting plaintiff's allegation.

There is no indication in the record that the parties have produced documents pursuant to the automatic disclosure rules which require the parties to disclose certain information as soon as practicable, *see* Fed.R.Civ.P. 26(a)(1), D.Mass.R. 26.1(B). In particular, there has apparently been no production of documents relevant to the *Gartenberg* factors.[8] When the opposing party is the only practical source for discovering the specific facts supporting a pleader's conclusion, less specificity of pleading may be required pending discovery. *See Boston & Maine Corp. v. Town of Hampton*, 987 F.2d 855, 865 (1st Cir.1993) (stating that "a court may allow some discovery before requiring" plaintiff to make a particularized pleading where the facts are peculiarly within defendants' control); *Freedman v. City of Allentown*, 853 F.2d 1111, 1114 (3d Cir.1988) (allowing limited discovery "when [a complaint's] lack of factual specificity is fairly attributable to defendants' control of [the] required information"). Because the Court must proceed under the notice pleading standard, plaintiff has made allegations to support some of the *Gartenberg* factors, and there is an allegation of lack of access to the relevant information, the motion to dismiss is *DENIED* as to Count III.

## IV. *ORDER*

The defendants' motion to dismiss (Docket No. 35) is *ALLOWED* with respect to Counts I and II, and *DENIED* with respect to Count III.

---

7. Defendant argues that this allegation is unfair because that total revenue necessarily includes all revenues from the parent holding company, FMR Corp., which has unrelated, non-mutual fund businesses such as discount stock brokerage and venture capital. However, at this pleading stage, I can not consider this additional information.

8. The Court has stayed discovery (but not automatic disclosure) pending resolution of the motion to dismiss.