Kevin KING and David L. Massarano, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

Sam P. DOUGLASS, Nolan Lehmann, Gregory J. Flanagan, Robert L. Knauss, John W. Storms, Francis D. Tuggle, Edward E. Williams, Gary R. Petersen, Equus Capital Management Corp., and Equus II, Inc., Defendants.

Kevin KING and David L. Massarano, Plaintiffs,

v.

EQUUS CAPITAL MANAGEMENT CORP., Defendant and Equus II, Inc., Nominal Defendant.

Civil Action No. H–96–1033.

United States District Court, S.D. Texas.

Dec. 23, 1996.

Evan B. Glick, Houston, TX, Jeffrey M. Haber, John Halebian, Wechsler Harwood Halebian and Feffer, New York City, for plaintiffs.

Craig Smyser, Jr., Christina A. Bryan, Smyser Kaplan & Veselka, Houston, TX, for defendants.

**ORDER**

HARMON, District Judge.

Pending before the Court in the above referenced class action and derivative complaint, brought pursuant to Sections 36(a) and 36(b) of the Investment Company Act of 1940 ("ICA"), 15 U.S.C. § 80a–35(a) and (b) (1976) and alleging violations of the ICA and common-law breach of fiduciary duties to a closed-end fund's shareholders and *ultra vires* acts, illegally conducted without the required approval vote of a majority of the shares, are the following motions: Plaintiffs Kevin King and David L. Massarano's motion for class certification pursuant to Rule 23(b)(3) (instrument # 19); Defendants Sam P. Douglass, Nolan Lehmann, Gregory Flanagan, Robert L. Knauss, John W. Storms, Francis D. Tuggle, Edward E. Williams, Gary R. Peterson,[1] Equus Capital Management Corporation ("ECM" or "the Adviser"), and Equus II, Inc.'s ("the Fund's")[2] amended motion to dismiss (# 26); and Defendants' motion to partially stay discovery (# 28). Plaintiffs seek declaratory relief and damages.

Plaintiffs' complaint, at 10, explains that unlike open-end funds, which can repeatedly hold public offerings of new shares, closed-end funds do not usually issue new shares after the initial offering and therefore do not

1. Sam P. Douglass is Chairman of the Board of Directors and Chief Executive Officer of the Fund, and serves as Chairman and Chief Executive Officer of the Investment Adviser, Equus Capital Management Corporation ("ECM"), and the Sub–Adviser. Nolan Lehmann is director and president of the Fund, and director of Adviser ECM and the Sub–Advisor. Gregory J. Flanagan, Robert L. Knauss, John W. Storms, Francis D. Tuggle, Edward E. Williams, and Gary R. Petersen are directors of the Fund. Plaintiffs assert that Douglass, Lehmann, and Williams are "interested persons" of the Fund, as defined in the ICA, and could benefit indirectly from the rights offering at issue because of their relationship with ECM.

2. Equus II, Inc. ("the Fund") is a business development company and a closed-end fund that attempts to achieve capital appreciation by investing in equity and equity-oriented securities issued by privately owned companies. Like most close-ended funds, the Fund trades at a discount as to net asset value ("NAV") of the common stocks owned by it, which in the Fund's case is a

discount of approximately 30%. As of December 31, 1995 the Fund's net assets were approximately $61.9 million, or $19.71 per share. The Fund's common stock is listed and trades on the American Stock Exchange.

ECM has served as the Fund's investment adviser since the Fund's inception in 1991 and also provides some administrative services to the Fund. Under an agreement with the Fund, ECM receives a quarterly management fee at the annual rate of 2% of the Fund's total quarterly assets. Such an arrangement means that ECM benefits from an offer that increases the amount of the assets of funds under its management. Plaintiffs' complaint asserts that ECM will benefit from the rights offering at issue here, possibly by as much as $250,000, while the directors of the Fund who voted to authorize the offering could benefit indirectly because of their relationships with ECM. The Adviser is also entitled to receive an incentive fee equal to 20% of the net realized capital gains of the Fund, less unrealized depreciation on a cumulative basis. Such an advisory fee, claim Plaintiffs, is higher than such fees paid by most other investment companies.

expand through infusions of new, outside capital. Instead, closed-end funds usually expand only through the gradual increase in the value of their underlying portfolio. Plaintiffs allege that Equus II, Inc. ("the Fund"), here, has been hurt by the steep discount of the market price of its stock in relation to its NAV, approximately 30%, in the past three years.

Kevin King currently owns 10,000 shares of the Fund, while David Massarano owns 1,199 shares. Plaintiffs sue on behalf of themselves and a proposed class of all persons who owned shares of the Fund as of March 5, 1996 other than named Defendants here. On that date, the complaint alleges, in breach of their fiduciary duties, the Fund's directors, the Fund, and the Fund's investment adviser, all Defendants here, announced that the Fund would conduct a rights offering and issue up to 1,046,191 new shares of stock, thereby increasing the number of outstanding shares by up to 33% if fully subscribed.[3] Pointing to authority in the investment field, Plaintiffs assert that in most cases, since closed-end funds cannot sell shares whenever they need more cash, such rights offerings to shareholders are not for the benefit of the shareholders because they constitute a way to extort more money from existing shareholders who feel compelled to pay for initial shares to avoid having the value of their holdings diluted. Plaintiffs contend that the Securities and Exchange Commission ("SEC"), in interpreting and applying the ICA, has indicated that a closed-end fund's directors and investment adviser have a heavy burden to demonstrate that a proposed rights offering's "expected" benefits "clearly outweigh" any injury to participating and nonparticipating shareholders. Plaintiffs contend that the March 1996 rights offering will injure both participating and nonparticipating shareholders by diluting both the net asset value ("NAV") and the market value of their investment in the Fund. Plaintiffs also bring this action pursuant to Section 36(b)[4] of the ICA derivatively, on behalf of the Fund, against its investment adviser, ECM, for breach of fiduciary duty regarding the Fund's compensation.

More specifically, the complaint explains that on December 31, 1995, the Fund's shares traded at a 30% discount to the NAV of the stocks owned, and that at the end of February 1996, the Lipper Analytic Survey ranked the Fund's 26.6% discount as the largest of those it surveyed.[5]

Plaintiffs argue that by pricing the 1996 transferable rights offering's new shares at a

---

**3.** Plaintiffs elsewhere explain that under the terms of the offering, the Fund's existing shareholders have an opportunity to subscribe for or purchase one right for every share of stock they own. For every three rights, the shareholders could buy one new share of stock at a discount to the pre-offering share price quoted on the American Stock Exchange. Plaintiffs' memorandum in opposition to Defendants' motions to dismiss, defer ruling on class certification and partially stay discovery (# 33), at 2.

**4.** Section 36(b) of the ICA provides in relevant part,

for the purpose of this subsection, the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection by the Commission, or by a security holder of such registered adviser, or any affiliated person of such investment advisor, or any other person enumerated in

subsection (a) of this section who has a fiduciary duty concerning compensation or payments, for breach of fiduciary duty in respect of such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person.

15 U.S.C. § 80a–35(b)(2). Section 36(b) continues to state that proof of a defendant's misconduct is unnecessary and that approval by the board of directors or shareholders of the adviser's compensation "shall be given such consideration by the court as is deemed appropriate under all the circumstances." Section 80a–35(b)(1) and (2). Recovery is limited to actual damages for a period of one year prior to suit. Section 80a–35(b)(3).

**5.** As background, Plaintiffs state that to reduce the discount, on June 22, 1994 the Fund's Board of Directors approved a stock repurchase plan. In accordance with that plan, the Fund repurchased on the open market and canceled 46,200 shares of its stock for $640,159 in 1994. In 1995, the Fund repurchased, at a discount of 33.61% from its NAV, and canceled 145,500 shares of its stock for $1,9993,642. The Fund has not repurchased any more of its stock since.

steep discount to current market prices, the offering imposes a downward pressure on the trading price for the Fund's shares and threatens dilution of existing shareholders' interests.[6] Moreover because of the "coercive" structure of the rights offering, Plaintiffs claim that existing shareholders are faced with three unsatisfactory choices: purchasing additional shares of newly issued stock at a steep discount to the Fund's NAV, suffer dilution of their pro rata ownership interest in the Fund and monetary damage to their existing investment, or sell their shares in a depressed market and suffer market damages.

Under the ICA and under Delaware common law, allege Plaintiffs, the Director Defendants and Adviser ECM have fiduciary duties to the Fund's shareholders to act fairly, equitably and with due care in promoting and protecting the interests of the Fund's shareholders. Therefore, when faced with a proposed discounted rights offering, since section 23(b) of the ICA[7] generally prohibits a registered, closed-end investment company from selling to the public its shares at a price below the NAV with certain exceptions, because transferable rights offerings below the NAV involve dilution of existing shareholders' assets, earnings, and relative voting power the fiduciary directors and adviser bear a heavy burden to demonstrate the "expected" benefits of the offering "clearly outweigh"[8] injuries to the shareholders of the Fund. Before approving such an offering, the fidu-

---

6. In their memorandum in support of their amended motion to dismiss for failure to state a claim at 2, Defendants state, "The decision to conduct the rights offering was the result of the directors' conclusion, after careful consideration, that the offering would benefit shareholders by, among other things, broadening the shareholder base, reducing the fund's expense ratio, permitting the fund to diversify its investments, and improving the fund's profile in the investment community."

7. Section 23(b) provides, in relevant part,

No registered closed-end company shall sell any common stock of which it is the issuer at a price below the current net asset value of such *stock, exclusive of any distributing commission or discount ...,* except (1) in connection with an offering to the holders of one or more classes of its capital stock; (2) with consent of a majority of its common stockholders; ... or (5) *under such circumstances as the Commission* may permit by rules and regulations or orders for the protection of investors.
15 U.S.C. § 80a–23(b) (1976).

8. Subsequently, in a reply (instrument # 35), Defendants point out that Plaintiffs continue to use this language of "clearly outweigh" for the standard for directors, as set out in the 1977 letter, "Interpretive Position Relating to Rights Offering by Closed End Investment Companies Below Net Asset Value," Release No. IC–9932, Fed. Sec. L. Rep. Vol. 6(CCH) par. 48,868, at 37,643 (Sept. 15, 1977) (the "1977 Release") (to meet fiduciary obligations in evaluating rights offerings involving sales at a price below the NAV, the board of directors of a closed-end company must (1) determine that there was a reasonable likelihood that existing shareholders would exercise a very substantial majority of the rights and (2) make a good faith determination that the offering would result in a net benefit to shareholders). In a 1985, in a No–Action letter through the Associa-

tion of Publicly Traded Investment Funds ("APTIF"), 1985 WL 54277 at *11 (Aug. 2, 1985), because this 1977 standard in effect almost prohibited transferable rights offerings of a closed end investment company at below the NAV the SEC concluded that the first condition was not necessary to protect investors and that transferable rights offerings at less than NAV fall within the exception in Section 23(b)(1) of the ICA provided that 1) the offering "fully protects shareholders' preemptive rights and does not discriminate among shareholders ...; 2) management uses its best efforts to ensure an adequate trading market in the rights for use by shareholders who do not exercise such rights; and 3) the ratio of the offering does not exceed one new share for each three rights held." These conditions serve to limit the negative effect on shareholders who choose not to exercise their rights. Moreover it contains an express statement, id., that "This position supersedes [the interpretation in the 1977 letter] [except] that with respect to all rights offerings, the directors must make a good faith determination that the offering would result in a net benefit to existing shareholders." Furthermore, a subsequent SEC 1993 No–Action Letter also does not use the "clearly outweigh" standard. "Closed–End Investment Company (Transferable Rights Offering)," 1993 WL 45914, at *1 and 3 (SEC Jan 26, 1993). Thus even though the directors still must conclude in good faith that the offering would result in a net benefit to existing shareholders, so that such nonexercising shareholders will be compensated for any dilution, there is no "clearly outweigh language. Rather, id. at *3, the letter states that "Section 23(b) attempts to strike a balance between protecting existing shareholders against dilution and providing sufficient flexibility for closed-end investment companies to raise additional capital where the company is unable to raise sufficient capital by selling to shareholders alone."

ciaries must demonstrate that the benefits created by the offering (1) are "expected" benefits, not just possible, speculative, or hoped for benefits, (2) will accrue to all shareholders, whether they exercise their rights or not, and (3) are larger than the harm caused by the approved offering.

Plaintiffs maintain that the transferable rights [9] offering by Defendants will depress the market trading values of the Fund's shares for all shareholders and dilute the value of shareholder investment in the Fund, especially for shareholders who do not exercise their rights. Nor, argue Plaintiffs, are the dilutive effects offset by the "speculative" benefits claimed by Defendants, i.e., providing the Fund with capital to pay down debt and reduce the Fund's expense ratio and providing existing shareholders with an opportunity to purchase additional shares of common stock at a price that may be below market value of NAV without the transaction costs that would be associated with open-market purchases. Furthermore, the amount of the management fees paid to ECM will increase with the increase in total assets.

Plaintiffs insist that under Section 23(b) of the ICA, 15 U.S.C. § 80a–23(b), closed-end funds are prohibited from conducting the kind of discounted offering at issue here:

> No registered closed-end company shall sell any common stock of which it is the issuer at a price below the current net asset value of such stock, exclusive of any distributing commission or discount.

While Section 23(b)(1) permits funds to make discounted offering to their current shareholders, Plaintiffs insist that the SEC has repeatedly stated that

> [T]he exceptions in Section 23(b) for sales or issuances at a price below NAV are designed for exceptional and not routine circumstances.

"Closed-End Investment Company (Transferable Rights Offering)," 1993 WL 45914, at *1 (SEC Jan 26, 1993) (the "1993 Letter") (referring to the 1977 Release). *See also* "Interpretive Position Relating to Rights Offering by Closed End Investment Companies Below Net Asset Value," Release No. IC–9932, Fed. Sec. L. Rep. Vol. 6(CCH) par. 48,868, at 37,643 (Sept. 15, 1977) (the "1977 Release")("[Discounted closed-end rights offerings are only justified in] rare circumstances [where] the sale would be in the interest of the Company and not to the substantial derogation of its shareholders.").

Having provided this background on the nature of Plaintiffs' claims, the Court addresses the pending motions. Defendants' motion to partially stay discovery requests the Court to defer ruling on the class certification issues until after it has resolved Defendants' amended motion to dismiss, which asserts that Plaintiffs lack standing to assert any direct claims against Defendants. If the Court rules that all of Plaintiffs' direct class action allegations are derivative in nature and must be brought in a shareholder derivative suit, Plaintiffs' class action claims should be dismissed and the class certification will be a moot issue. Because this contention makes logical sense, the Court addresses the amended motion to dismiss first.

 Defendants' amended motion to dismiss under Fed.R.Civ.P. 12(b)(6) summarizes Plaintiffs' claims as three: (1) Defendants' rights offering should not be permitted on public policy grounds, i.e., that closed-end funds should not be permitted to have rights offerings at below the NAV; (2) the rights offering here constitutes a breach of fiduciary duty; and/or (3) the rights offering amounts to an *ultra vires* act. Defendants argue that these allegations fail to state a claim for which relief can be granted, that Plaintiffs lack standing to assert the direct cause of action on which they base their class action claim, and that because Plaintiffs' direct claims are actually derivative in nature, the direct claims should be dismissed.[10] In-

---

**9.** There are two kinds of rights offerings, transferable and nontransferable. Transferable rights may be sold in the market, in this case the American Stock Exchange, if the shareholder chose not to purchase the right.

**10.** Plaintiffs' complaint asserts a derivative claim against ECM on behalf of the fund for breach of fiduciary duty under section 36(b) of the ICA, 15 U.S.C. § 80a–35(b), that is based on the same allegations against Defendants for which Plaintiffs seek to present a class action pursuant to

stead, Plaintiffs' suit in essence is a claim for the diminution of the value of the Fund's shares, not for any injury from Defendants' conduct causing Plaintiffs individualized damages disproportionate to the number of shares each Plaintiff owns.

Defendants further assert that the breach of fiduciary duty claim is fatally vague and that the complaint makes only a conclusory allegation, without providing any facts or specifics about Defendants' acts or omissions. Under Delaware law and the ICA, such vague claims fail to state a claim upon which relief can be granted. Instead, Plaintiffs must allege facts of sufficient specificity to show (1) the existence of a fiduciary relationship between the parties; (2) a breach of the duty; and (3) Defendants' knowing participation in that breach. 15 U.S.C. § 80a–35(a)–(b); *Penn Mart Realty Co. v. Becker*, 298 A.2d 349, 351 (Del.Ch.1972). Other than asserting that the rights offering constitutes a *per se* breach of fiduciary duty, Plaintiffs

have not specified any particular acts for which Defendants could be held liable and have cited no legal authority for their conclusory claim.

Defendants additionally argue that Plaintiffs fail to state a claim in maintaining that the rights offering is improper under federal securities law or SEC regulations. Rather, Plaintiffs' contentions are "nothing more than a policy-based argument that the law should prohibit rights offerings by closed-end funds." [11] Such an argument has no legal basis; indeed, contend Defendants, the SEC, exercising its regulatory power under the ICA, 15 U.S.C. §§ 80a *et seq.*, has ruled that the ICA permits rights offerings by such funds. Defendants insist that Plaintiffs are misleading the Court about the SEC's current position on transferable rights offerings below NAV for closed-end funds by arguing that such is permissible only under special circumstances. In fact, in a 1985 No–Action Letter,[12] the SEC reconsidered its position in

Section 36(a) of the ICA, 15 U.S.C. § 80a–35(a). Because the direct allegations are derivative in nature, argue Defendants, they must be asserted in a shareholder derivative suit. Therefore the Court should dismiss all Plaintiffs' direct allegations for failure to state a claim upon which relief can be granted. *In re Nuveen Fund Litigation*, 855 F.Supp. 950, 955 (N.D.Ill.1994).

Defendants maintain that state law determines whether Plaintiffs' claims are direct or derivative. *Kamen v. Kemper Fin. Services, Inc.*, 500 U.S. 90, 97–99, 111 S.Ct. 1711, 1716–18, 114 L.Ed.2d 152 (1991) (holding that non-conflicting state law governs federal rules of decision under the ICA); *Seidel v. Allegis Corp.*, 702 F.Supp. 1409, 1410–11 (N.D.Ill.1989) (concluding that state law general governs whether claims are derivative or personal). Under both Delaware and Texas law, a shareholder may not personally recover damages for a wrong done solely to the corporation, even though the shareholder may be injured by that wrong. *See, e.g., Bagdon v. Bridgestone/Firestone, Inc.*, 916 F.2d 379, 383 (7th Cir.1990) (applying Delaware law), *cert. denied*, 500 U.S. 952, 111 S.Ct. 2257, 114 L.Ed.2d 710 (1991); *Brug v. The Enstar Group, Inc.*, 755 F.Supp. 1247, 1257 (D.Del.1991)(applying Delaware law); *Wingate v. Hajdik*, 795 S.W.2d 717, 719 (Tex.1990); *Kramer v. Western Pac. Indus., Inc.*, 546 A.2d 348, 351 (Del.1988). "[T]o recover individually, a stockholder must prove a personal cause of action and personal injury." *Wingate*, 795 S.W.2d at 719; *Kramer*, 546 A.2d at 351; *Lipton v. News Int'l. Plc*, 514 A.2d 1075, 1078 (Del.1986). Injuries suffered by the corporation which merely result in the depreciation of the value of shareholders' stock do not give

shareholders a separate and independent right of action. *Wingate*, 795 S.W.2d at 719; *Kramer*, 546 A.2d at 353. "This rule is based on the principle that where such injury occurs each shareholder suffers relatively in proportion to the number of shares he owns, and each will be made whole if the corporation obtains restitution or compensation from the wrongdoer." *Massachusetts v. Davis*, 140 Tex. 398, 168 S.W.2d 216, 221 (1942), *cert. denied*, 320 U.S. 210, 63 S.Ct. 1447, 87 L.Ed. 1848 (1943).

11. Defendants argue that such vague policy-based arguments are of no import in light of the SEC's decision that rights offerings are authorized under certain conditions.

12. The Association of Publicly Traded Investment Funds("APTIF") in 1985 requested the SEC to re-examine the position it took in the 1977 Release. The resulting 1985 No–Action Letter expressly stating that it "supersedes the Division's previous interpretation regarding transferable rights offerings ... set forth in [the 1977 Release]")...." Kirkpatrick, Lockhart, Hill & Phillips, SEC No–Action Letter, [1985 Transfer Binder] Fed. Sec. L. Rep. (CCH) (August 2, 1985) (exhibit C at p. 12), The 1985 No–Action Letter states that the ICA allowed rights offerings at below NAV by closed end-funds to the extent that

1) the offering fully protects shareholders' preemptive rights and does not discriminate among shareholders;

2) management uses its best efforts to ensure an adequate trading market in the rights for use by shareholders who do not exercise such rights;

the 1977 Release cited by Plaintiffs. This Court concurs. *See also* footnote 7.

■ Defendants assert that their rights offering complied with the ICA and with the SEC's current guidelines because 1) the Fund's rights offering protected shareholders' preemptive rights over nonshareholders and did not discriminate among shareholders; 2) The Fund's management used its best efforts to ensure an adequate trading market in the rights by listing those rights for sale on the American Stock Exchange; 3) the ratio of the Fund's rights offering did not exceed one new share for each three rights held; and 4) the Equus Board of Directors determined in good faith and in their business judgment that the offering would result in a net benefit to existing shareholders, including those who would choose not to exercise their rights.[13] Defendants emphasize that the Equus directors *twice* determined that the rights offering would result in a net benefit to existing shareholders: first, when they decided to issue the rights offering and again, after Plaintiffs filed this suit, but before the rights offering was held. Because the ICA confers on the SEC primary jurisdiction to promulgate rules governing closed-end rights offerings, Defendants characterize this action as "an attempt to get this Court to invade the primary jurisdiction of the SEC" and insist that it should be dismissed for failure to state a claim.

Moreover, Defendants argue that because Plaintiffs do not allege that the directors failed to exercise their independent business judgment in good faith in connection with the

rights offering, the business judgment rule precludes a claim for breach of fiduciary duty. *See generally Polk v. Good,* 507 A.2d 531, 536 (Del.1986); *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173, 180 (Del.1985); *Priddy v. Edelman,* 883 F.2d 438, 444 (6th Cir.1989). Defendants complain that Plaintiffs do not claim that the Defendant directors failed to perform a good faith analysis of the benefits and detriments of the rights offering but merely assert that in their opinion the offering would not produce a net benefit for existing shareholders. Defendants maintain that the business judgment rule precludes such an allegation as a matter of law, especially in light of Plaintiffs' failure to allege any specific facts to demonstrate that the directors did not perform a good faith analysis.

Defendants argue that Plaintiffs' *ultra vires* conduct claim is based on a skewed selection of portions of the Fund's Certificate of Incorporation and misrepresentation of the whole. Specifically Plaintiffs maintain that the Certificate of Incorporation limits the directors' power to authorize a rights offering because it "expressly prohibits the sale of shares at a price less than the fund's net asset value without the approval of a majority of the fund's shareholders." Complaint at 30. They further assert that "because of this express prohibition ..., the director Defendants exceeded their legal authority when they caused, permitted and approved the Fund's issuance and sale of shares in the Offerings at a price below" the NAV. *Id.* According to Defendants, a reading

---

3) the ratio of the offering does not exceed one new share for each three rights held; and 4) the directors make a good faith determination that the offering would result in a net benefit to existing shareholders.

Moreover, the APTIF Inquiry Letter questioned the SEC's earlier stance that such rights offerings below net asset value should only be done in exceptional circumstances and argued that the ICA's legislative history reflects that such sales could occur in a number of situations and that the requirement that a reasonable likelihood that existing shareholders exercise a very substantial majority of the rights was unnecessarily restrictive. In another No–Action Letter in 1993, the SEC indicated that if the closed-end investment company satisfied the four requirements set forth in the 1985 No–Action Letter, it was in compli-

ance with the ICA. *See* 1993 No–Action Letter, Ex. D, 1993 WL 45914 (S.E.C.).

**13.** Under the business judgment rule, corporate decision-makers are not liable for business decisions made on an informed basis, in good faith, and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes. *Polk v. Good,* 507 A.2d 531, 536 (Del. 1986); *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173, 180 (Del.1985). A corporate decision-maker acts in good faith if his conduct is genuinely motivated by an honest desire to benefit the business' shareholders and not by some other purpose such as personal gain. *Priddy v. Edelman,* 883 F.2d 438, 444 (6th Cir. 1989); Dennis J. Block et al., *The Business Judgment Rule: Fiduciary Duties of Corporate Directors and Officers* 15 (1987).

of the complete Certificate of Incorporation, attached as Exhibit E to their memorandum in support of their amended motion to dismiss, reveals that holding the rights offering was well within the directors' authority. Article Eighth expressly authorizes the Board to issue and sell stock on terms and conditions that the Board determines are in the best interest of the Fund. This power is restricted by Article Tenth, which requires approval of a majority of shareholders for only certain transactions not at issue here, i.e., for stock sales that would constitute a merger, consolidation or statutory share exchange, the sale of substantially all the assets of the corporation, the liquidation or dissolving of the corporation, or the conversion of the corporation into an open-end management investment company. Article Tenth does not prohibit the directors from selling additional shares in the Fund without approval of the majority of the shareholders. Therefore, argue Defendants, the *ultra vires* claim should be dismissed for failure to state a claim under Rule 12(b)(6); *Associated Builders, Inc. v. Alabama Power Co.*, 505 F.2d 97, 100 (5th Cir.1974).

Finally, Defendants maintain the Plaintiffs' derivative claim [14] under Section 36(b) of the ICA, 15 U.S.C. § 80a–35(b), also fails to state a claim because Plaintiffs do not allege that the Fund adviser's fee arrangement is improper or that the arrangement was not the product of a disinterested transaction. Section 36(b), dealing with the reasonableness of fee contracts between investment funds and their advisers, ensures that the adviser's fee "represents a charge within the range of what would have been negotiated at arm's-length in light of all surrounding circumstances." *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 928 (2d Cir.1982), *cert. denied*, 461 U.S. 906, 103 S.Ct. 1877, 76 L.Ed.2d 808 (1983). *See also Kalish v. Franklin Advisers, Inc.*, 928 F.2d 590, 592 (2d Cir.), *cert. denied*, 502 U.S. 818, 112 S.Ct. 75, 116 L.Ed.2d 48 (1991); *Meyer v. Oppenheimer Mgmt. Corp.*, 895 F.2d 861, 866 (2d Cir.1990). Although Plaintiffs allege that for the rights offering ECM received a disproportionately large fee, they do not assert anything about the fee arrangement nor claim that the fee was not the product of an arm's-length transaction. In turn, Defendants maintain that the offering did not involve an underwriter and that ECM received no fee for it. The only benefit ECM can anticipate is approximately $200,000 annually associated with the additional investment funds that the offering generated. Thus there is no claim stated under Section 36(b).

Plaintiffs' response in opposition insists that they have alleged an injury separate and distinct from that of all shareholders and therefore have standing to sue in their own right. They state generally that shareholders were not equally affected by the rights offering.

As for their breach of fiduciary duty claim under the ICA and state law, they maintain that the defense of the business judgment rule is not available to Defendants for the following reasons. Plaintiffs insist that Defendants did not fully inform themselves of harm to shareholders compared to net benefits of the rights offering, or even perform a rudimentary analysis, that no effort was made to analyze empirically those benefits nor to question the propriety of the offering. Defendants injured the existing shareholders because the new share was offered at the extremely low price of $12.75 per share, a 46.54% discount to the NAV. Plaintiffs have also asserted that Defendants have breached their duty of loyalty by approving a transaction that benefitted ECM and some individual Defendants at the expense of shareholders and by structuring the rights offering to dilute shareholder proportionate ownership in the Fund. Plaintiffs argue that because Defendants have violated their duty of loyalty, good faith, and due care, they are not entitled to the protection of the business judgment rule. Rather Defendants bear the burden of demonstrating the fairness of the transaction, *Nixon v. Blackwell*, 626 A.2d 1366, 1375–76 (Del.1993), but Plaintiffs insist

---

**14.** Plaintiffs allege that "Equus Capital's pressuring and/or instructing the ... Directors to approve the Rights Offering conferred a substantial damage on the Fund" and that as a result "Equus Capital breached its fiduciary duties to the Fund and its shareholders." Complaint at 29, par. 87–88.

that the price, the discount to the NAV, and the process, i.e., little or no debate or empirical analysis, make that burden impossible to satisfy.

More specifically, regarding the standing issue, Plaintiffs concur that state law determines whether a plaintiff's claims are direct or derivative and argue that since the Fund is a Delaware corporation, Delaware law should govern the federal rules of decision under the ICA.[15] *Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 97–99, 111 S.Ct. 1711, 1716–18, 114 L.Ed.2d 152 (1991). Under Delaware law a court should examine the complaint to determine whether the alleged wrongs state a direct, individual cause of action. *Elster v. American Airlines, Inc.,* 100 A.2d 219, 223 (Del.Ch.1953); *Kramer v. Western Pacific Indust.,* 546 A.2d 348, 352 (Del.1988). Plaintiffs insist that they have suffered a special injury separate and distinct from any injury to all shareholders generally. *Elster,* 100 A.2d at 222; *Lipton,* 514 A.2d at 1078. To sue directly, a plaintiff must allege either an injury separate and distinct from that to other shareholders or a wrong involving a contractual right of the stockholders, such as the right to vote, that exists independently of any right of the corporation. *In re Tri–Star Pictures, Inc. Litig.,* 634 A.2d 319, 330 (Del.1993). "A claim of stock dilution and a corresponding reduction in a stockholder's voting power is an individual claim." *Id.* Plaintiffs assert that although all shareholders were affected by the rights offering, they were not affected equally and they sustained different injuries. Plaintiffs pinpoint the harm to shareholders who would not or could not subscribe and who therefore suffered greater dilution of their proportionate ownership interest in the Fund, including the NAV and market value of the Fund's stock and their proportionate voting interest in the Fund, in contrast to the harm to those shareholders who participated and could therefore partially mitigate the injury to themselves. *Alleghany v. Breswick & Co.,* 353 U.S. 151, 160, 77 S.Ct. 763,

769, 1 L.Ed.2d 726 (1957). Plaintiffs point to cases where courts have held that dilution from the issuance of additional common stock creates a direct, not a derivative, harm. *Lochhead v. Alacano,* 697 F.Supp. 406, 411–13 (D.Utah 1988); *Swanson v. American Consumer Indus.,* 415 F.2d 1326 (7th Cir.1969); *Zinman v. FDIC,* 567 F.Supp. 243 (E.D.Pa.1983); *Cadiz v. Jimenez,* 571 F.Supp. 932 (D.P.R.1983). *See also Bennett v. Breuil Petroleum Corp.,* 99 A.2d 236, 240–41 (Del.Ch.1953) (in an action to cancel stock issued under a plan adopted by a statutory vote because the stock was to be sold for grossly inadequate consideration, the court stated that any purchase at the low price in which the plaintiff, though offered his pro rata share, did not participate "obviously dilutes his interest and impairs the value of his original holdings"). Furthermore courts have allowed shareholders to assert direct claims where the underlying transaction affects the corporation as a whole, but affects certain shareholders disproportionately. *Dowling v. Narragansett Capital Corp.,* 735 F.Supp. 1105, 1113 (D.R.I. 1990) (holding an action to be direct where the directors who proposed the sale of corporate assets, at below fair value, had a financial interest in the corporation to which the assets were sold); *Perlman v. Feldmann,* 219 F.2d 173, 178 (2d Cir.), *cert. denied,* 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277 (1955); *Chase Nat'l Bank v. Sayles,* 30 F.2d 178, 183 (D.R.I.1927); *Traylor v. The Marine Corp.,* 328 F.Supp. 382, 384 (E.D.Wis.1971). *See also Empire Life Ins. Co. v. Valdak Corp.,* 468 F.2d 330, 335 (5th Cir.1972). Plaintiffs cite commentators who recognize the propriety of individual rather than derivative actions where there is disproportionate treatment of shareholders. Moreover, argue Plaintiffs, Delaware courts have concluded that economic dilution accompanied by diminution of a shareholder's proportionate voting power, as is the situation here, is a direct, not a derivative, harm. *Tri–Star Pictures,* 634 A.2d 319 (in an individual action

---

**15.** Plaintiffs disagree that Texas law would apply, and point out that under Texas law, unlike Delaware law, that a fiduciary duty to shareholders directly is not cognizable. *Gearhart Indus., Inc. v. Smith Int'l, Inc.,* 741 F.2d 707, 721–11 (5th

Cir.1984)("the directors' duty of loyalty and care run to the corporation, not to individual shareholders or even to a majority of the shareholders").

alleging stock dilution and a corresponding reduction in a stockholder's voting power, "the practical effect of cash-value dilution is to increase the value of the controlling stockholder's interest at the sole expense of the minority"). So have courts in other jurisdictions. *Lochhead,* 697 F.Supp. at 412; *Grafman v. Century Broadcasting Corp.,* 727 F.Supp. 432, 435 (N.D.Ill.1989). Plaintiffs distinguish factually the claims in the instant suit from those in the cases cited by Defendants, except *Nuveen,* 855 F.Supp. 950. They distinguish *Nuveen* on the grounds that it involved Minnesota, not Delaware, law.

Regarding their claims for breach of fiduciary duty under federal and state law, Plaintiffs reiterate that under the ICA Defendants were required to determine whether the expected benefits of the offering outweighed any dilutive effects on existing shareholders. Addressing Defendants' argument that the 1985 No–Action Letter modified 1977 Release of the SEC, Plaintiffs insist that the former maintained the position in the 1977 Release that the board should determine in good faith that the rights offering "would result in a net benefit to existing shareholders." Association of Publicly Traded Investment Funds, SEC No–Action Letter, 1995 WL 54277, at *10 (S.E.C. Aug. 2, 1985). Moreover, assert Plaintiffs, in 1993 the SEC issued another No-action Letter, 1993 WL 45914, reiterating the obligations of directors in transferable rights offerings:

> Accordingly, the Division continues to require that the closed-end company's board of directors determine in good faith that the offering would result in a net benefit to existing shareholders, including those who choose not to exercise their rights. This means that the company's board of directors must conclude in good faith that non-exercising shareholders will be compensated for their dilution. For example, non-exercising shareholders may derive a benefit from the offering if it enables the company's adviser to invest additional assets that earn a return that exceeds the dilution. In addition, a rights offering increases the company's total assets, which also may benefit existing shareholders by reducing expense per share due to the spreading of fixed expenses over a larger asset base.

1993 WL 45914 at *2.

Urging that the ICA's fundamental purpose is to prevent self-dealing on the part of those managing and controlling investment companies and to protect shareholders from self-dealing advisers, Plaintiffs argue that Section 36(a) allows suits against persons engaging in "any act or practice constituting a breach of fiduciary duty involving personal misconduct in respect of any registered investment company for which such person so serves or acts." 15 U.S.C. § 80a–35. Section 36 functions as a catch-all fiduciary duty section to interact with other sections of the ICA that are narrowly tailored to address specific issues. *Brown v. Bullock,* 194 F.Supp. 207, 238–39 n. 1 (S.D.N.Y.), *aff'd,* 294 F.2d 415 (2d Cir.1961). *Accord Burks,* 441 U.S. at 481–82 n. 10, 99 S.Ct. at 1839 n. 10; *Steadman v. SEC,* 603 F.2d 1126, 1142 (5th Cir.1979), *aff'd,* 450 U.S. 91, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981); *SEC v. Advance Growth Capital Corp.,* 470 F.2d 40, 55 n. 21 (7th Cir.1972); *Rosenfeld v. Black,* 445 F.2d 1337, 1342–50 (2d Cir.1971); *Aldred Inv. Trust v. SEC,* 151 F.2d 254, 260 (1st Cir.1945), *cert. denied,* 326 U.S. 795, 66 S.Ct. 486, 90 L.Ed. 483 (1946); *Omni Fin. Corp. v. Cohen,* No. 92 Civ. 6837, 1994 WL 97125, at *9 (S.D.N.Y. Mar.22, 1994).

Under the ICA, note Plaintiffs, before making a rights offering directors are required to make a good faith and detailed inquiry about the *bona fides* of the offering and to consider a number of factors, including but not limited to, the size of any current and proposed discount; the extent of any dilution, which should normally be minimal, for nonparticipating shareholders; the basis of the offering (number of rights needed to purchase one share); the size of the offering in relation to the number of shares outstanding; the use to be made of the proceeds from the offering and the return to shareholders therefrom; whether a market will exist for any transferable rights; and the compensation to any underwriter. 1977 Release, 1977 WL 15713 at *4. Charging that Defendants either failed to consider or failed to give

appropriate weight to these factors, Plaintiffs point out that Defendants have conceded that dilution to nonparticipating shareholders could be "substantial," and that Defendants have barely mentioned the return of any proceeds to shareholders from the offering and only speculate that "the increase in the net assets of the Fund may reduce the Fund's expense ratio, thus benefitting both participating and non-participating stockholders." Plaintiffs question whether the expense ratio will be reduced, since the actual fee paid to ECM will increase. While Defendants state in the final registration statement that the increase in assets will be used to repay the Fund's indebtedness only, such does not justify the cost at 46% below NAV of the offering to shareholders ($20 million to pay down approximately $13.3 million of debt, which was not scheduled to mature for another year). Nor will there be money left to use for investment and asset growth.

Charging that Douglass, Lehmann and Williams are "interested persons" of the Fund as defined in the ICA because of their affiliation with ECM, the complaint alleges that they breached their fiduciary duty of loyalty. Plaintiffs argue that the remaining Defendants are supposed to be "independent watchdogs" with a duty to supervise and assess the analyses and recommendations of ECM, Douglass, Lehmann and Williams under the regulatory scheme of the ICA, a responsibility which the complaint alleges that they abdicated. Plaintiffs emphasize that because discounted rights offerings are generally disfavored by Congress, the SEC, and the investment company industry because they have substantial dangers due to their dilutive effects, the directors are therefore required to make a good faith determination, prior to approval of the transaction, that the offering's dilutive effects will be "clearly outweighed" by expected net benefits to all existing shareholders. Plaintiffs do not argue that all below-NAV rights offerings are *per se* improper, but assert that such transactions are proper only where directors can demonstrate that a reasonable, good-faith determination prior to the offering indicates that the transaction would create a net benefit for both participating and nonpar-

ticipating shareholders. They insist Defendants breached their duty in this regard.

Plaintiffs argue that whether a director acted in good faith or reasonably is a question of fact not ripe for determination on a motion to dismiss. *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199 (Del.1993); *Lewis v. Fuqua*, 502 A.2d 962, 971 (Del.Ch.1985).

■ A director has a duty to act advisedly with due care, as well as in good faith. The defense of the business judgment rule is available only to Directors "who have both adequately informed themselves before voting on the business transaction at hand and acted with the requisite care." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 367 (Del. 1993), *modified on reargument*, 636 A.2d 956 (Del.1994); *see also Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del.1985); *Sealy Mattress Co. v. Sealy, Inc.*, 532 A.2d 1324, 1337 (Del. Ch.1987).

■ A director also has a duty of loyalty, which "mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and shared by the stockholders generally." *Cede*, 634 A.2d at 361. There is no bright line rule or fixed measure to determine whether a director has breached his duty of loyalty, a fact issue not ripe for determination in a motion to dismiss. *Id.* at 364. Plaintiffs allege that the coercive structure of the transaction, which forces shareholders to exercise their rights not because the offering is a wealth-increasing transaction but because otherwise their investment and voting power would be diluted, constitutes a breach of the directors' duty of loyalty. *AC Acquisitions Corp. v. Anderson, Clayton & Co.*, 519 A.2d 103, 113–15 (Del.Ch.1986); *Kahn v. United States Sugar Corp.*, 1985 WL 4449 at *5 (Del.Ch.1985); *Shamrock Holdings, Inc. v. Polaroid Corp.*, 559 A.2d 278, 287–88 (Del. Ch.1989); *Eisenberg v. Chicago Milwaukee Corp.*, 537 A.2d 1051, 1061–62 (Del.Ch.1987).

Plaintiffs also argue that Defendants are not entitled to protection of the business judgment rule because the offering price was not fair, nor was the process one of fair

dealing, considered by a committee of disinterested, independent directors.

As for their claim against ECM under Section 36(b), Plaintiffs insist they have stated a claim for which relief is available. They have alleged that ECM receives a management fee comparably higher than that received by most other investment companies, and that Douglass and Lehmann have influence over the Fund and ECM, which raises a reasonable question about breach of fiduciary duties under the statutory provision.

Plaintiffs contend that Defendants seek a summary judgment on largely factual questions, not properly made in a Rule 12(b)(6) motion.

Defendants' reply argues that a motion to dismiss is an appropriate' way to handle this "strike suit"[16] or "jeremiad against rights offerings generally without any specific allegations against these directors"[17] filed by Plaintiffs merely (1) to challenge an ordinary business decision of the directors of an investment fund to raise new money by offering to sell stock on equal terms to all shareholders and (2) to argue that increasing corporate debt was a better way to generate money for new investments than a rights offering. Defendants represent that the aim of a strike suit is "to last long enough to take enough discovery to learn a few facts that can be tortured into surviving summary judgment and then to extort a settlement with the threat that trying the case poses a danger to the existence of the company." They maintain that the case should be dismissed for two reasons: (1) that Plaintiffs' claims are derivative in nature, since the rights offering treated all shareholders equally and their only injury was that suffered in common with all other shareholders, therefore making a shareholders' derivative suit the proper vehicle, and (2) because the rights offering was an ordinary business transaction, Plaintiffs must plead facts to show breach of fiduciary duty and an abrogation of the protection of the business

judgment rule. Furthermore, Defendants insist that the ICA preempts Plaintiffs' common law breach of fiduciary duty claims.

More specifically, Defendants contend that the allegation that the rights offering depressed the NAV and the market value of the Fund's stock by increasing the investment adviser fees paid by the Fund is a classic derivative claim. *Kramer v. Western Pac. Indus., Inc.,* 546 A.2d 348, 353 (Del. 1988). Where the assertion is made that a board action has had an adverse impact on the financial condition of the company and depressed the value of its shares, courts have ruled that the injury, if any, is to the corporation and not the shareholders. *Kauffman v. Dreyfus Fund, Inc.,* 434 F.2d 727, 732–33 (3d Cir.1970), *cert, denied,* 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1971); *Marcus v. Putnam,* 60 F.R.D. 441, 443–44 (D.Mass. 1973); *Herman v. Steadman,* 50 F.R.D. 488, 490 (S.D.N.Y.1970).

Defendants argue that "[v]irtually all cases brought under Section 36(a) of . . . [ICA] are brought as derivative actions." Defendants' Reply at 4. *See, e.g., Tannenbaum v. Zeller,* 552 F.2d 402 (2d Cir.), *cert. denied,* 434 U.S. 934, 98 S.Ct. 421, 54 L.Ed.2d 293 (1977); *Fogel v. Chestnutt,* 533 F.2d 731 (2d Cir. 1975), *cert. denied,* 429 U.S. 824, 97 S.Ct. 77, 50 L.Ed.2d 86 (1976); *Moses v. Burgin,* 445 F.2d 369 (1st Cir.), *cert. denied,* 404 U.S. 994, 92 S.Ct. 532, 30 L.Ed.2d 547 (1971); *Levitt v. Johnson,* 334 F.2d 815 (1st Cir.1964), *cert. denied,* 379 U.S. 961, 85 S.Ct. 649, 13 L.Ed.2d 556 (1965); *Brouk v. Managed Funds, Inc.,* 286 F.2d 901 (8th Cir.), *cert. denied,* 366 U.S. 958, 81 S.Ct. 1921, 6 L.Ed.2d 1252 (1961), *vacated as moot per curiam,* 369 U.S. 424, 82 S.Ct. 878, 8 L.Ed.2d 6 (1962); *M.J. Whitman & Co., Inc. Pension Plan v. American Fin. Enterprises, Inc.,* 552 F.Supp. 17 (S.D.Ohio 1982), *aff'd,* 725 F.2d 394 (6th Cir.1984).

Moreover, contend Defendants, Plaintiffs' dilution claims are not a separate and distinct injury, required to maintain a direct

---

**16.** H.C. Black, *Black's Law Dictionary* at 1276 (Fifth ed. West 1979), defines a "strike suit" as a "Shareholder derivative action begun with the hope of winning large attorney's fees or private settlements, with no intention of benefiting corporation on behalf of which suit is theoretically brought."

**17.** Defendants' Reply, #35, at 20.

shareholder action. The rights offering treated and affected all shareholders identically and equally: it granted all shareholders their preemptive rights to purchase additional Fund shares or to transfer, i.e., to sell, their rights to purchase such additional shares in the open market. The shareholders, not the company, determined whether they would maintain or reduce their percentage of ownership in the company by electing to purchase or to transfer their rights. Plaintiffs' characterization of the offering as "coercion" is a misstatement of the applicable law and a misrepresentation of the facts. Any shareholder who bought shares in the Fund knew that the company could in the future raise additional capital though a rights offering. As both SEC No–Action Letters and the ICA make apparent, all transferable rights offerings require a shareholder to decide whether or not to exercise the right to purchase additional shares. To take Plaintiffs' argument to its logical conclusion, to characterize such a decision as coercive means that a company could never raise additional capital by selling additional shares of stock because the shareholders would always be "coerced" into having to choose whether or not to purchase. The well established law of preemptive rights allows a shareholder to protect his proportionate ownership interest by purchasing additional shares when the company issues them. Such preemptive rights do not allow shareholders the power to preclude the company from issuing additional shares by claiming that if such shares are issued, they would be coerced into buying them to avoid dilution. *See Assoc. of Publicly Traded Investment Funds ("APTIF")*, 1985 letter, 1985 WL 54277 at *3 ("... the recognition of pre-emptive rights by investment companies provides 'a relatively effective weapon for the protection of the stockholder against dilution.' ").

Defendants distinguish this case, where the Fund gave all shareholders equally the opportunity to maintain their proportionate interest, from the cases cited by Plaintiff for the proposition of allowing shareholder claims based on allegations of dilution involved disparate treatment of minority shareholders, improper efforts to take over control of a company, or disproportionate offerings to some shareholders or offerings only to third parties directly or as part of a merger. They present Plaintiffs' authority in graph form with summaries of the nature of the action and the category each fits. The only remaining cited authority, *Bennett v. Breuil Petroleum Corp.*, 99 A.2d 236, is a case in which the court concluded that plaintiff had in part stated a direct complaint for cancellation of stock only because he had alleged that the issuance was allegedly made by a defendant with intent to adversely affect a particular shareholder to impair his interest and force him out of the corporation on the management's terms.[18]

Defendants contend that just because some shareholders choose not to exercise their right to purchase does not transform a claim for diminution in assets and stock value into a direct claim for dilution. A shareholders's action or inaction does not change the nature of a derivative claim, nor does it create a dilution claim. *Nuveen*, 855 F.Supp. at 955 (distinguishing situation from that in *Alleghany Corp.*, 353 U.S. at 160, 77 S.Ct. at 769, and in *Lochhead*, 697 F.Supp. at 411–13, both of which Plaintiffs rely on heavily).[19]

Moreover, argue Defendants, Plaintiffs' breach of fiduciary duty claims are devoid of factual content, or of alleged "bad acts," and do not state a cognizable claim under either Section 36(a) of the ICA or Delaware law. They merely assert that the directors conducted a rights offering at below the NAV, as permitted by the ICA, and that it was a bad business decision. They impermissibly ask

---

**18.** The court stated, *id.* at 241, "There is now a complaint for cancellation on two grounds ... issuance for improper purpose and for inadequate consideration. Assuming that the first ground is personal to plaintiff, nevertheless, I am persuaded that the second is derivative."

**19.** The *Nuveen* court wrote,

> Defendants did not cause the change in proportional ownership; if all [of] the ... funds' shareholders had participated in the [rights] offerings, their proportionate voting rights would have remained the same. Shareholders' individual responses to the [rights] offerings are irrelevant. Defendants' behavior was the same toward all shareholders.

this Court to second guess this business decision to raise capital through a rights offering as opposed to increasing debt, Plaintiffs' preferred method. Defendants insist that the business judgment rule protects such decisions.

Assuming for the moment that Plaintiffs' interpretation of the SEC's position regarding the directors' duties in issuing a rights offering is correct,[20] Defendants argue that Plaintiffs' complaint fails to allege a violation of the requirements for determining whether the expected benefits of the offering clearly outweighed any dilutive effects on existing shareholders. All Plaintiffs have asserted is that they disagree with the directors' resolution of the issue. Nor have Defendants the burden to show compliance with SEC requirements, absent sufficient pleading by Plaintiffs. Defendants insist that all shareholders who chose not to exercise their rights to purchase were compensated by, or received the net benefit of, the right to sell, and did sell, their rights to new shares to other shareholders. Thus, urge Defendants, Plaintiffs fail to state a claim that directors breached their duties as set out by the SEC.

Regarding Plaintiffs' claims for breach of fiduciary duty under section 36(a) of the ICA, Defendants reply that directors do not claim that their conduct is immunized from scrutiny because they offered rights to all shareholders. Rather, the directors maintain that to charge them with a breach of fiduciary duty, Plaintiffs must make a good faith factual presentation that supports their contention that directors acted improperly. Simply asserting that the injury outweighed any purported benefit to the shareholders does not satisfy the requirement. *See, e.g., Nuveen,* 855 F.Supp. 950, where there were allegations that the rights offering was made against financial advice and as part of an ongoing business of fee generation through multiple offerings, in contrast with the instant case where the challenged rights offering was the Fund's first and where the Fund has performed at record levels both before

and after the rights offering. Similarly the conclusory allegation that the offerings were proposed *solely* to generate fees for ECM regardless of consequences to the funds involved and their shareholders is unsupported by any facts.

Defendants also challenge Plaintiffs' assertion that the directors bear a heavy burden to demonstrate that their decision was *bona fide* and that the return from the offering was speculative. The offering's clearly stated and accomplished purpose was to raise more than $13 million to pay down debt and to assist in making following commitments to old investments and to invest in other companies. The simple assertion that interested persons serve on the board of the Fund does not state a claim for breach of the duty of loyalty, especially when five out of the eight board members were and are not interested directors and all of those five voted to approve the rights offering. The burden of proof is not on the directors to demonstrate that prior to the rights offering they determined reasonably and in good faith that the net benefits of the offering outweighed the negatives; rather, the burden is on Plaintiffs to plead facts that show that the directors did not make a good faith determination. Plaintiffs' rambling review of case law on breach of directors' duties is devoid of facts supporting such allegations, a hallmark of a strike suit to obtain just enough to extort a settlement because of the high costs of defense and risk to the company.

Defendants further charge that Plaintiffs have failed to plead a claim that defeats the protection afforded by the business judgment rule to directors for disagreements with the directors' ordinary business decisions. The business judgment rule states that the business decisions of disinterested directors "will not be disturbed if they can be attributed to any rational business purpose." *Sinclair Oil Corp. v. Levien,* 280 A.2d 717, 720 (Del.1971). Plaintiffs have not alleged

**20.** Plaintiffs Memorandum at 28–32 concludes that the directors were required to determine that

... the offering would result in a net benefit to existing shareholders, *including those who*

*chose to not exercise* their rights. This means that the company's board of directors must conclude in good faith that non-exercising shareholders will be compensated for their dilution.

that the directors lacked any rational business purpose in making the rights offering. Furthermore, where the majority of the members of the board are independent, outside directors, as is the case here with the Fund's directors, the Delaware Supreme Court has held that the presumption of the propriety afforded the directors' decisions is heightened. *Ivanhoe Partners v. Newmont Min. Corp.,* 535 A.2d 1334, 1343 (Del.1987) ("with the independent directors in the majority, proof that the board acted in good faith and upon reasonable investigation is materially enhanced"); *see also Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946, 955 (Del.1985) (Approval of a transaction by a majority of independent, disinterested directors almost always bolsters a presumption that the business judgment rule attaches to transactions approved by a board of directors that are later attacked on the grounds of lack of due care.). Even though a majority of the Fund's directors are independent, outside directors and even though the board unanimously approved the rights offering, Plaintiffs simply presume that they have rebutted the heightened presumption of propriety afforded by the business judgment rule and argue that the transaction fails both prongs of the entire unfairness test.[21] Defendants insist that the fairness test arises only when the burden of proof has shifted to the Defendants and that it is procedurally inapposite to address it at this stage of pleading.[22] Defendants further challenge Plaintiffs' argument that the Fund traded at a steep discount to the NAV and that the Fund was not viewed favorably by shareholders or the marketplace. Defendants argue that to the contrary, the discount to the NAV results from the nature of the Fund's holdings, mostly privately owned companies that do not trade on the open market and are difficult for the market to value, and accordingly, whose value the market discounts.

Moreover, argue Defendants, even if Plaintiffs had stated a claim for breach of fiduciary duty under Delaware law, the ICA preempts their claim because Delaware law is in conflict with it. *Burks v. Lasker,* 441 U.S. 471, 479 and n. 6, 99 S.Ct. 1831, 1837 and n. 6, 60 L.Ed.2d 404 (1979). The ICA's regulatory scheme permits offerings of additional shares by investment companies below the NAV under certain circumstances, so state law tort claims for breach of fiduciary duty for holding a rights offering are preempted. 15 U.S.C. §§ 23, 36.

■ Section 36(b) of the ICA imposes a fiduciary duty on investment company advisers not to receive excessive compensation. *Meyer v. Oppenheimer Management Corp.,* 895 F.2d 861, 866 (2d Cir.1990)(citing 15 U.S.C. § 80a–35(b)). An advisory fee violates Section 36(b) only if it "is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Id.; see also Krinsk v. Fund Asset Management, Inc.,* 875 F.2d 404, 409 (2d Cir.), *cert. denied,* 493 U.S. 919, 110 S.Ct. 281, 107 L.Ed.2d 261 (1989). Although Plaintiffs did conclusorily allege that ECM received a disproportionately large fee in relation to fees paid by most other investment companies, Plaintiffs failed to allege that ECM earned a fee not *commensurate with the services it provided or that it could not have been the product of a disinterested business transaction.* Therefore these allega-

21. Under Delaware law, when the presumption of the business judgment rule has been rebutted, the burden shifts to the defendants to demonstrate the unfairness of the board's action. In *Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1156, 1162–63 (Del.1995), the Delaware Supreme Court describes this test:

The concept of fairness has two basic aspects: fair dealing and fair price. The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained. The latter aspect of fairness relates to the economic and financial consider-

ations of the proposed [transaction], including all relevant factors.... [T]he test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness.

22. They further state that Plaintiff fails to acknowledge that the burden of proof shifting does not occur in contexts other than takeovers or battles for control where Delaware courts find an inherent danger of director conflict of interests. *Unocal,* 493 A.2d at 954; *Bennett v. Propp,* 187 A.2d 405, 409 (Del.1962).

tions should be dismissed. *Meyer*, 895 F.2d at 866; *Krinsk*, 875 F.2d at 409; *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923, 928 (2d Cir.1982), *cert. denied*, 461 U.S. 906, 103 S.Ct. 1877, 76 L.Ed.2d 808 (1983).

In reviewing the sufficiency of a complaint in response to a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6), before any evidence has been submitted, the district court's task is limited. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support its claims. *Id.* The district court should consider all allegations in favor of the plaintiff and accept as true all well-pleaded facts in the complaint. *Lawal v. British Airways, PLC*, 812 F.Supp. 713, 716 (S.D.Tex.1992). Dismissal is not appropriate "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of [his] claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

After reviewing the record and the applicable law, this Court concludes for the reasons set forth below that Defendants are correct in maintaining that Plaintiffs' claims here are not direct claims, but claims that are in actuality derivative in nature. Plaintiffs lack standing to bring them individually or as a class action; instead, these claims should properly be brought on behalf of all shareholders of the Fund in a shareholder derivative suit.

The threshold question here is whether this suit is properly brought as a direct suit and a class action because the injury is direct to the plaintiffs, or whether the nature of the injury is to the corporation and the stockholders collectively and should be brought as a shareholder derivative suit. Although the ICA is a federal statute, non-conflicting state law, including state corporate law, must be incorporated into the federal rule of decision. *Kamen v. Kemper Financial Serv., Inc.*, 500 U.S. at 97–99, 111 S.Ct. at 1716–18 (1991). A federal court sitting in diversity must apply the choice of law rules of the state in which it sits. *Klax-

on v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477, As the forum state, Texas' choice-of-law principles, adopting the "most significant relationship" test of the American Law Institute's Restatement (Second) of Conflicts, requires the Court to apply the substantive law of the state with the most significant relationship to the case and the procedural law of the forum state. *Gutierrez v. Collins*, 583 S.W.2d 312, 318 (Tex.1979). While both parties have cited case law from numerous jurisdictions on the issue, there has not been focussed briefing on the choice of law issue here and the parties appear to concur that because the Fund was incorporated under Delaware law, Delaware law governs the question of whether the claims asserted by Plaintiffs here are direct or derivative. *Kamen*, 500 U.S. at 97–99, 111 S.Ct. at 1716–18. This Court further notes that under Article 8.02 of the Texas Business Corporation Act Annotated (Vernon Supp.1996), "[T]he laws of the jurisdiction of incorporation of a foreign corporation shall (1) govern the internal affairs of the foreign corporation, including but not limited to the rights, powers, and duties of its board of directors and shareholders and matters relating to its shares...." Accordingly, the Court applies Delaware law.

Under Delaware law, one looks to the nature of the wrongs alleged in the body of the complaint, and not to a plaintiff's designation or stated intention, to determine whether a cause of action is a personal one asserted by a shareholder or by a number of plaintiffs a class action, or a derivative one. *Brug v. Enstar Group, Inc.*, 755 F.Supp. at 1257, *citing Lipton*, 514 A.2d at 1078. An individual or class action may be maintained only when the shareholder plaintiffs have been injured directly, rather than indirectly through harm to the corporation. *Id., citing Kramer*, 546 A.2d at 351. The test to distinguish between derivative and individual harm is whether the plaintiffs have suffered a "special injury," i.e., an injury distinct from that suffered by all shareholders generally or one involving the shareholder's contractual rights, such as the right to vote. *Id., citing Lipton*, 514 A.2d at 1078. "The distinction

between derivative and individual actions rests upon the party being directly injured by the alleged wrongdoing.... To have standing to sue individually, rather than derivatively on behalf of the corporation, the plaintiff must allege more than an injury resulting from a wrong to the corporation. For a plaintiff to have standing to bring an individual action, he must be injured directly or independently of the corporation." *Kramer*, 546 A.2d at 351. An alleged wrong involving a corporation is individual in nature when it injures the shareholders directly or independently of the corporation. *Id., cited for this proposition by Katz v. Halperin*, 1996 WL 66006 at *5 (Del.Ch. Feb. 5, 1996). A wrong is derivative in nature when it injures the shareholders indirectly and dependently through direct injury to the corporation. *Id.*

Furthermore, Delaware courts have long characterized suits alleging mismanagement that depresses the value of stock as a wrong to the corporation or stockholders collectively that should be enforced by a derivative action. *Kramer*, 546 A.2d at 353. "Any devaluation of the stock is shared collectively by the shareholders, rather than independently by the plaintiff or other individual shareholder. Thus the wrong alleged is entirely derivative in nature." *Id.* Therefore the injury asserted by Plaintiffs is derivative in nature. "Where a plaintiff shareholder claims that the value of his stock will deteriorate and that the value of his proportionate share of the stock will be decreased as a result of

alleged director mismanagement, his cause of action is derivative in nature." *Katz*, 1996 WL 66006 at *6.

 Here Plaintiffs allege that the rights offering will reduce the NAV and the market value of the Fund's shares and dilute the value of existing shareholder's interests. They further assert that some of the directors, because of their breach of fiduciary duty and self dealing in voting for the rights offering, and ECM will gain benefits in increased fees because of the increase in shares and assets held by the fund. Such alleged acts will affect all shareholders equally, proportionate to each shareholder's ownership interest. Moreover, Plaintiffs' allegations that the effect on shareholders' voting rights will be disproportional because some will exercise their rights and purchase new, additional stock while others must also fail as a basis for a direct claim. Plaintiffs have not asserted a breach of contract claim here. Furthermore, Defendants' actions were the same as to all shareholders and did not disproportionately create the change in ownership or ultimately in voting rights; the shareholders chose whether to participate or not. *See Alleghany*, 353 U.S. at 160, 77 S.Ct. at 769. As indicated by the proportionate rights offering and the SEC's 1985 and 1993 No–Action letters,[23] in compliance with Section 23(b) of the ICA, all shareholders were given an equal opportunity; those who did not wish to exercise their rights had the option of selling this property right on the American Stock Exchange for value.[24] Thus

---

23. See footnotes 8 and 12.

24. Plaintiffs rely on *In re Tri–Star Pictures, Inc. Litigation*, 634 A.2d 319, 330 (Del.1993) for the rule that "[a] claim of stock dilution and a corresponding reduction in a stockholder's · voting power is an individual claim." This case is easily distinguishable from *Tri–Star*. In the context of a merger, the Coca–Cola Company and its affiliates controlled 56.6% of Tri–Star Pictures' common stock. Coca Cola planned to create a new company by combining its Entertainment Sector with Tri–Star. In structuring the combined entity, Coca–Cola exchanged $745 million in Entertainment Sector assets, fraudulently overvalued by $200 million, for newly issued Tri–Star stock worth more than $900 million. The minority shareholders sued Coca–Cola, alleging that Coca–Cola delayed providing the value of the assets to guarantee it an 80% controlling

interest in Tri–Star. The result was that the minority shareholders' interest in Tri–Star was decreased from 43.4% to 20%. After the combination, Sony Corporation merged into Tri–Star and bought out each Tri–Star shareholder at $27 a share. The Delaware Supreme Court rejected the defendants' argument that the diminution in the value of the minority shares was an injury suffered by all shareholders equally; rather the cumulative effect of the transactions was to diminish the value of the minority interests until their value at the time of the Sony merger was reduced. Coca–Cola, as the majority shareholder of Tri–Star was not similarly affected because they benefitted from the inflated valuation of the Entertainment Sector Assets; any diminution the majority shareholder suffered in the cash liquidation value of Coca–Cola's shares resulting from the post-merger write down of assets was offset by the windfall Coca–Cola received from

the Court concludes that all direct injury claims duty should be dismissed.

■ Ironically Plaintiffs have alleged a derivative claim on behalf of the Fund against ECM regarding ECM's fiduciary duty under 36(b) of the ICA in receiving compensation for services from the Fund. Such a claim can only be brought by a shareholder in a direct action. *See Daily Income Fund, Inc. v. Fox,* 464 U.S. 523, 104 S.Ct. 831, 78 L.Ed.2d 645 (1984)(holding that because 36(b) expressly provides for enforcement only by the SEC and security holders of the company and an investment company has no implied right of action under it, Fed. R.Civ.P. 23.1, setting forth pleading requirements for a derivative suit, does not apply to such a claim).

■ Defendants have argued that the allegations of *ultra vires* acts in the rights offering are not cognizable and should be dismissed for failure to state a claim because the Certificate of Incorporation as well as SEC regulations reveal that the rights offering is within the directors' authority. The Court fully agrees, but because the Certificate is not part of the pleadings, dismissal of them under 12(b)(6) is not permissible. Nevertheless if Plaintiffs choose to amend their complaint to assert derivative claims and to plead with factual particularity, they may wish the reexamine their *ultra vires* claim.

■ Defendants' challenges to the breach of fiduciary duty claims and unrea-

sonable fee arrangement with ECM on the grounds of vague pleading and lack of factual support in the context of the business judgment rule have merit. While in the context of a motion to dismiss under Rule 12(b)(6), the Court will accept a plaintiff's well-pleaded facts as true, it will not take as true conclusory allegations of fact. Moreover Plaintiff-shareholders must overcome the presumptions of the business judgment rule, asserted by Defendants, before they will be permitted to pursue derivative claims. *Rales v. Blasband,* 634 A.2d 927, 933 (Del.1993). The business judgment rule requires the trial court to presume that directors have acted in good faith and in the honest belief that their actions served the corporation's best interest. *Grobow v. Perot,* 539 A.2d 180, 187 (1988). If they do not satisfy the requirement of making a demand on the board of directors and wish the Court to excuse them from doing so, to rebut the presumption created by the business judgment rule, plaintiffs must plead sufficient, particularized facts that create a reasonable doubt that (a) the directors were disinterested [25] and independent [26] or (b) that the challenged action was otherwise the result of a valid exercise of business judgment in the honest belief that the action served the best interest of the company. *Aronson v. Lewis,* 473 A.2d 805, 814 (1984). Thus to plead a derivative action, Plaintiffs here need to allege facts that demonstrate that directors were incapable of making an independent and disinterested judgment or raise a

the combination. The Delaware Supreme Court concluded that Coca–Cola's manipulation of corporate matters caused a special economic injury to minority interests.

In *Tri–Star,* unlike this case, there was not equal diminution of the value of all stockholders' interest. Furthermore, unlike here where no breach of contract claim has been asserted, the minority shareholders alleged that the wrong involved their contractual right to vote. In *Tri–Star* proxy statements were made that contained misrepresentations, which in turn interfered with and manipulated the voting process by convincing the misinformed minority shareholders to vote in such a way as to reduce their stock's voting power and value. As a result, the minority shareholders suffered a disproportionate dilution of stock voting power and value in contrast to the majority shareholders, who actually expe-

rienced increased value. The court allowed the minority shareholders to assert direct, individual claims. Here the shareholders were all affected proportionately and identically and there is no breach of contractual rights or fraudulent misrepresentation alleged.

**25.** A director is "interested" in a transaction if either that transaction will provide the director with a personal financial benefit not equally shared by other shareholders or that the director stands on both sides of the transaction. *Aronson,* 473 A.2d at 815.

**26.** A director is "independent" if he or she is capable of making decisions based on the merits of the subject rather than the extraneous "considerations or influences." *Aronson,* 473 A.2d at 816.

reasonable doubt[27] that substantive nature of the challenged transaction and the board's approval of it were not valid exercises of business judgment and not in the best interest of the company.

The Court has indicated that it agrees with Defendants regarding the SEC's current interpretation of requirements for a permissible rights offering below NAV by a closed-end company under Section 23(b) of the ICA. Nevertheless, Plaintiffs' arguments regarding the good faith of the directors, use of best efforts, their actions to determine whether the rights offering would result in a net benefit to existing shareholders, and the inapplicability of the business judgment rule as a defense are not adequately pleaded and are not appropriately resolved in a motion to dismiss pursuant to Rule 12(b)(6) because Plaintiffs should be given an opportunity to replead to cure deficiencies and because the arguments require evidentiary support outside the pleadings.

Accordingly, for reasons indicated above, the Court

ORDERS that Defendants' motion to dismiss Plaintiffs' direct claims and, by implication, motion for class certification is granted. Furthermore Defendants' motion to partially stay discovery is now MOOT. The Court grants Plaintiffs twenty days from receipt of this order to file an amended complaint or to inform the Court that they will not replead and the dismissal should be made final. Failure to comply will result in dismissal of this suit. If Plaintiffs filed an amended derivative complaint, Defendants are granted leave to move to dismiss again if appropriate.

---

**27.** The Delaware Supreme Court has refused to establish a particular "reasonable doubt" standard. *Grobow,* 539 A.2d at 186.